[No. 9652. *En Banc.* September 27, 1911.]

THE STATE OF WASHINGTON, *on the Relation of Davis-Smith Company, Plaintiff,* v. C. W. CLAUSEN, *State Auditor, Defendant.*[1]

MANDAMUS — STATE WARRANTS — ACTIONS — PARTIES ENTITLED— QUESTIONS—CONSTITUTIONALITY OF ACT. In mandamus to the state auditor to compel the auditing of a state warrant, the auditor may raise the question of the constitutionality of the act authorizing the warrant and requiring its payment; his duty to conserve public funds constituting a sufficient interest.

CONSTITUTIONAL LAW—LIBERTY TO CONTRACT—REGULATION OF OC-CUPATIONS — PUBLIC POLICY — WORKINGMEN'S COMPENSATION. The workingmen's compensation act, Laws 1911, p. 345, which requires employers in extra hazardous employments to contribute fixed sums based upon their pay rolls to create a fund to reimbuse all employees injured in such employments, without regard to negligence or common law liability therefor, and provides that no employer shall exempt himself from the burden or waive the benefits of the act by any contract or regulation, and that any such contract or regulation shall be void *pro tanto,* is not unconstitutional as inter-fering with the right of contract; since "liberty" to contract is not absolute, and means absence from arbitrary restraint, not immunity from reasonable regulation and prohibition enforced in the interests of the community by public policy.

CONSTITUTIONAL LAW—DUE PROCESS OF LAW—REGULATION OF OC-CUPATIONS—WORKINGMEN'S COMPENSATION ACT—POLICE POWER. Art. 1, § 3, of the state constitution and the 14th amendment to the Federal constitution, which provide that no person shall be deprived of property without due process of law, are not violated by the work-ingmen's compensation act, Laws 1911, p. 345, in that it creates a liability without fault on the part of employers in extra hazardous employments to contribute fixed sums based upon their pay rolls to create a fund to reimburse all employees injured in such employ-ments without regard to negligence or common law liability there-for, and also takes the property of one employer to pay the obliga-tions of another; since it is within the police power as a reasonable enactment in support of economic and moral considerations affect-ing the protection of the public health, safety or welfare, although it incidentally deprives some persons of property without fault; and since it is not so utterly unreasonable or extravagant as to capri-ciously interfere with or destroy private rights.

[1]Reported in 117 Pac. 1101.

CONSTITUTIONAL LAW—CLASS LEGISLATION—POLICE POWERS. The constitutional provisions against class legislation does not take from the state the power to classify in the adoption of police regulations, and permits of a wide discretion in that respect.

STATUTES—CONSTITUTIONALITY—EFFECT OF PARTIAL INVALIDITY. It was competent for the legislature in the workingmen's compensation act, Laws 1911, p. 345, to provide that the adjudication of invalidity of any part of the act shall not affect the validity of the act as a whole or any other part of it; and anything that might have been eliminated by the legislature can be eliminated by the courts, if it is unconstitutional, without affecting the balance of the act.

CONSTITUTIONAL LAW—CLASS LEGISLATION—REGULATION OF OCCUPATIONS—WORKINGMEN'S COMPENSATION ACT. The workingmen's compensation act, Laws 1911, p. 345, does not violate the constitutional restrictions against class legislation in that its contributions exacted from the numerous industries are diverted to the relief of that particular class of injured and disabled workmen, instead of being applied to the use of injured workmen generally or the state at large; that being one of the prerogatives of legislation.

SAME—EQUAL PROTECTION OF THE LAWS. Such act requiring employers in hazardous employments to create a fund out of which losses to employees shall be paid is not a denial to owners of property of the equal protection of the laws.

CONSTITUTIONAL LAW—REGULATION OF OCCUPATIONS—LICENSE TAX—TAXATION—EQUALITY. The workingmen's compensation act, Laws 1911, p. 345, assessing employers in extra hazardous employments fixed sums based upon the amount of their pay rolls, to create a fund to reimburse injured employees, does not violate the constitutional provisions designed to secure equal and uniform taxation of property; since the same is not a general tax, but is in the nature of a license tax for revenue and regulation and not subject to the constitutional limitations in question.

CONSTITUTIONAL LAW—POLICE POWER—RIGHT TO JURY TRIAL—REGULATION OF OCCUPATIONS—WORKINGMEN'S COMPENSATION ACT. It is competent for the legislature, in the reasonable exercise of the police power, to regulate extra hazardous industries by compelling employers engaged therein to pay a fixed sum to be used for the compensation of injured employees, and to require such employees to accept specified sums for certain injuries in lieu of their common law right of damages; and the abolition of all such rights of action and defenses therein, and the substitution in lieu thereof of the schedule of damages provided in the act, to be paid employees out of the fund created, does not violate the constitutional provision guaranteeing the right to trial by jury, if the state in the exercise of the police power can abolish the right of action entirely.

CONSTITUTIONAL LAW—LEGISLATIVE AND JUDICIAL POWERS. The courts are not concerned with the wisdom of an act, and cannot declare it unconstitutional merely because it is unwise; the policy of a law being for the legislative branch of the government.

CHADWICK, J., dissents in part.

Application filed in the supreme court June 17, 1911, for a writ of mandamus to compel the state auditor to issue a warrant authorized by the workmen's compensation act. Granted.

W. V. Tanner (Harold Preston and Geo. A. Lee, of counsel), for plaintiff, contended, among other things, that the early law of torts authorized an action for trespass for accidental injuries, regardless of the intent of the trespasser. Whigmore, Essay on Legal Responsibility for Tortious Acts, Its History, 3 Select Essays on Anglo-American Legal History, pp. 474, 480, 507; 1 Street, Foundations of Legal Liability, pp. 76-78; McGehee, Due Process of Law, pp. 301, 362; Castle v. Duryee, 2 Keyes (N. Y.) 169; Holmes v. Mather (1875), 10 Ex. 261, 44 L. J. Exch. 176; Stanley v. Powell (1891), 1 L. R. Q. B. 86; Priestley v. Fowler, 3 Mees. & Wells 1. The nature and sphere of the police power is such as to authorize legislation of this character. Kansas Pac. R. Co. v. Mower, 16 Kan. 573; Commonwealth v. Alger, 7 Cush. 53; Thorpe v. Rutland etc. R. Co., 27 Vt. 140, 62 Am. Dec. 625; Railroad Co. v. Husen, 95 U. S. 465; People v. King, 110 N. Y. 418, 18 N. E. 245, 6 Am. St. 389, 1 L. R. A. 293; Chicago, B. & Q. R. Co. v. People etc., 200 U. S. 561; Crowley v. Christensen, 137 U. S. 86; Munn v. Illinois, 94 U. S. 113; Barbier v. Connolly, 113 U. S. 27; In re Kemmler, 136 U. S. 436; Camfield v. United States, 167 U. S. 518; Karasek v. Peier, 22 Wash. 419, 61 Pac. 33, 50 L. R. A. 345; State v. Carey, 4 Wash. 424, 30 Pac. 729; Smith v. Spokane, 55 Wash. 219, 104 Pac. 249; State v. Buchanan, 29 Wash. 602, 70 Pac. 52, 92 Am. St. 930, 59 L. R. A. 342; People v. Strollo, 191 N. Y. 42, 83 N. E. 573; Driscoll v. Allis-Chalmers Co., 144 Wis. 451, 129 N. W.

401; *Holden v. Hardy*, 169 U. S. 366; *Bowes v. Aberdeen*, 58 Wash. 535, 109 Pac. 369, 30 L. R. A. (N. S.) 709; *Chicago, Milwaukee & St. P. R. Co. v. Ross*, 112 U. S. 377. The limitations contained in the fourteenth amendment were not designed to limit or interfere with the state's exercise of the police power. McGehee, Due Process of Law, p. 306; *Barbier v. Connolly, supra; Jones v. Brim*, 165 U. S. 180; *L'Hote v. New Orleans*, 177 U. S. 587; *Cunnius v. Reading School District*, 198 U. S. 458. Police regulations will not be held to violate the due process clause of the constitution, unless unmistakably and palpably in excess of legislative powers. Freund, Police Power, § 63; McGehee, Due Process of Law, pp. 306, 308; *Gundling v. Chicago*, 177 U. S. 183; *McLean v. Arkansas*, 211 U. S. 539; *Atkin v. Kansas*, 191 U. S. 207; *McDaniels v. Connelly Shoe Co.*, 30 Wash. 549, 71 Pac. 37, 94 Am. St. 889, 60 L. R. A. 947; *Hurtado v. People of California*, 110 U. S. 516; *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U. S. 273; *State ex rel. Oregon R. & Nav. Co. v. Railroad Commission*, 52 Wash. 17, 100 Pac. 179; *Twining v. New Jersey*, 211 U. S. 78. The power of the legislature to abolish the doctrine of fellow servant is beyond question. *Mobile etc. R. Co. v. Turnispeed*, 219 U. S. 35; *Kiley v. Chicago, M. & St. P. R. Co.*, 138 Wis. 215, 119 N. W. 309, 120 N. W. 756; *Ditberner v. Chicago, M. & St. P. R. Co.*, 47 Wis. 138, 2 N. W. 69; *Missouri Pac. R. Co. v. Haley*, 25 Kan. 35; *Missouri Pac. R. Co. v. Mackey*, 33 Kan. 298, 6 Pac. 291; *Bucklew v. Central Iowa R. Co.*, 64 Iowa 603, 21 N. W. 103; *McAunich v. Mississippi etc. R. Co.*, 20 Iowa 338; *Vindicator Consol. Gold Min. Co. v. Firstbrook*, 36 Colo. 498, 86 Pac. 313; *Deppe v. Chicago etc. R. Co.*, 36 Iowa 52; *Peirce v. Van Dusen*, 78 Fed. 693; *Campbell v. Cook*, 86 Tex. 630, 26 S. W. 486; *Thompson v. Central R. & Banking Co.*, 54 Ga. 509; *Georgia Railroad v. Ivey*, 73 Ga. 499; *Missouri Pac. R. Co. v. Castle*, 172 Fed. 841. The same is true of the doctrine of contributory or comparative negligence. *Chi-*

*cago etc. R. Co. v. Still,* 19 Ill. 499, 71 Am. Dec. 236;
*Galena etc. R. Co. v. Jacobs,* 20 Ill. 478; *Chicago & N. R.
Co. v. Sweeney,* 52 Ill. 325; *Christian v. Macon R. & Light
Co.,* 120 Ga. 314, 47 S. E. 923; *Brunswick & W. R. Co. v.
Wiggins,* 113 Ga. 842, 39 S. E. 551, 61 L. R. A. 513;
*Willingham v. Macon & B. R. Co.,* 113 Ga. 374, 38 S. E.
843; *Central R. & Banking Co. v. Newman,* 94 Ga. 560,
21 S. E. 219; *Chicago & A. R. Co. v. Johnson,* 116 Ill. 206,
4 N. E. 381; *Carterville Coal Co. v. Abbott,* 181 Ill. 495,
55 N. E. 131; *Odin Coal Co. v. Denman,* 185 Ill. 413, 57
N. E. 192, 76 Am. St. 45; *Western Anthracite Coal & Coke
Co. v. Beaver,* 192 Ill. 333, 61 N. E. 335; *Nashville etc. R.
Co. v. Carroll,* 6 Heisk (Tenn.) 347; *Wichita & W. R. Co.
v. Davis,* 37 Kan. 743, 16 Pac. 78, 1 Am. St. 275; *Missouri
Pac. R. Co. v. Castle,* 172 Fed. 841; *El Paso & N. E. R.
Co. v. Gutierrez,* 215 U. S. 87; *Employers' Liability Cases,*
207 U. S. 463; *Ives v. South Buffalo R. Co.,* 201 N. Y. 271,
94 N. E. 431; *Holden v. Hardy, supra; Chicago, B. & Q.
R. Co. v. McGuire,* 219 U. S. 549. The legislature may
abolish the defense of assumption of risks. *Hall v. West &
Slade Mill Co.,* 39 Wash. 447, 81 Pac. 915; *Johnson v.
Southern Pac. Co.,* 196 U. S. 1; *Walker v. Carolina Cent.
R. Co.,* 135 N. C. 738, 47 S. E. 675; *Mott v. Southern R.
Co.,* 131 S. C. 234, 42 S. E. 601; *Cogdell v. Southern R.
Co.,* 129 N. C. 398, 40 S. E. 202; *Thomas v. Raleigh etc.
R. Co.,* 129 N. C. 392, 40 S. E. 201; *Carterville Coal Co.
v. Abbott,* and *Odin Coal Co. v. Denman, supra; Davis Coal
Co. v. Polland,* 27 Ind. App. 697, 60 N. E. 1124; *Island Coal
Co. v. Swaggerty,* 159 Ind. 664, 62 N. E. 1103, 65 N. E.
1026; *Narramore v. Cleveland etc. R. Co.,* 96 Fed. 298;
*Hailey v. Texas & Pac. R. Co.,* 113 La. 533, 37 South. 131;
*Murphy v. Grand Rapids Veneer Works,* 142 Mich. 677,
106 N. W. 211; *Kilpatrick v. Grand Trunk R. Co.,* 74 Vt.
288, 52 Atl. 531, 93 Am. St. 889; *Johnson v. Mammoth
Vein Coal Co.,* 88 Ark. 243, 114 S. W. 722, 123 S. W. 1180,
19 L. R. A. (N. S.) 646; *Coley v. North Carolina R. Co.,*

128 N. C. 534, 39 S. E. 43, 57 L. R. A. 817; *Id.*, 129 N. C.
407, 40 S. E. 195, 57 L. R. A. 817; *Lore v. American Mfg.
Co.*, 160 Mo. 608, 61 S. W. 678; *Schlemmer v. Buffalo etc.
R. Co.*, 205 U. S. 1.    Liability may be imposed upon one
who is in no manner at fault.    1 Street, Foundations of
Legal Liability, pp. 55-59; *The Osceola*, 189 U. S. 158;
*Sanders v. Stimson Mill Co.*, 32 Wash. 627, 73 Pac. 688;
*The Lottawanna*, 21 Wall. 558; *Heeg v. Licht*, 80 N. Y.
579, 36 Am. Rep. 654; *Fletcher v. Rylands, L. R.*, 3 H. L.
330, 1 Eng. Rul. Cas. 235; *Thomas v. Winchester*, 6 N. Y.
397, 57 Am. Dec. 455; *Tonawanda R. Co. v. Munger*, 5
Denio (N. Y.) 255; *Wells v. Howell*, 19 Johns. (N. Y.) 385;
*Noyes v. Colby*, 30 N. H. 143; *Tiffany v. Glover*, 3 G. Greene
(Iowa) 387; *Union Pac. R. Co. v. Rollins*, 5 Kan. 167;
*Sullivan v. Dunham*, 161 N. Y. 290, 55 N. E. 923, 76 Am.
St. 274, 47 L. R. A. 715; *Muller v. McKesson*, 73 N. Y. 195,
29 Am. Rep. 123; *Chicago etc. R. Co. v. Zernecke*, 183 U. S.
582; *Boyce v. Anderson*, 2 Pet. 150; *Bertholf v. O'Reilly*,
74 N. Y. 509, 30 Am. Rep. 323; *Minneapolis etc. R. Co. v.
Emmons*, 149 U. S. 364; *Missouri Pac. R. Co. v. Mackay*,
127 U. S. 205; *St. Louis etc. R. Co. v. Mathews*, 165 U. S.
1; *Rodemacher v. Milwaukee & St. P. R. Co.*, 41 Iowa 297,
20 Am. Rep. 592; *Hart v. Western R. Corp.*, 13 Met.
(Mass.) 99, 46 Am. Dec. 719; *Jensen v. South Dakota Cent.
R. Co.*, 25 S. D. 506, 127 N. W. 650; *Atchison etc. R. Co.
v. Matthews*, 174 U. S. 96; *Jones v. Brim*, 165 U. S. 180;
*Grissell v. Housatonic R. Co.*, 54 Conn. 447, 9 Atl. 137, 1
Am. St. 138; *Atlantic Coast Line R. Co. v. Riverside Mills*,
219 U. S. 186; *St. Louis etc. R. Co. v. Taylor*, 210 U. S.
281; *Kreymborg v. Thurston*, 63 Wash. 219, 115 Pac. 77;
*Glucina v. Goss Brick Co.*, 63 Wash. 401, 115 Pac. 843;
*Orient Ins. Co. v. Daggs*, 172 U. S. 557; *Texas & N. O. R.
Co. v. Miller*, 221 U. S. 408; *Wilmington Star Min. Co. v.
Fulton*, 205 U. S. 60; *Noble State Bank v. Haskell*, 219
U. S. 104; *Id.*, 219 U. S. 575; *Assaria State Bank v. Dolley*,
219 U. S. 121; *Ives v. South Buffalo R. Co.*, 201 N. Y. 271,

94 N. E. 431; *Engel v. O'Malley*, 219 U. S. 128; *Musco v. United Surety Co.*, 196 N. Y. 459, 90 N. E. 171, 134 Am. St. 851; *State v. Cassidy*, 22 Minn. 312, 21 Am. Rep. 765; *Charlotte etc. R. Co. v. Gibbes*, 27 S. C. 385, 4 S. E. 49; *Id.*, 142 U. S. 386; *People of New York etc. v. Squire*, 145 U. S. 175; *St. Louis Consol. Coal Co. v. Illinois*, 185 U. S. 203; *Louisville & N. R. Co. v. Melton*, 218 U. S. 36; *Kirby v. Pennsylvania R. Co.*, 76 Pa. St. 506; *Martin v. Pittsburg etc. R. Co.*, 203 U. S. 284. The act for the relief of disabled seamen is of this nature. *Buckley v. Brown*, Fed. Case, No. 2,092; *Reed v. Canfield*, Fed. Case, No. 11,641; *Peterson v. The Chandos*, 4 Fed. 645; *Holt v. Cummings*, 102 Pa. St. 212, 48 Am. Rep. 199; 3 Opinions of Attorneys General (U. S.) 683; 13 Opinions of Attorneys General (U. S.) 330. Also, the statutes creating liability for sheep killed by dogs. *McGlone v. Womack*, 33 Ky. Law 864, 111 S. W. 688; *Mitchell v. Williams*, 27 Ind. 62; *Van Horn v. People*, 46 Mich. 183, 9 N. W. 246, 41 Am. Rep. 59; *Cole v. Hall*, 103 Ill. 30; *Holst v. Roe*, 39 Ohio St. 340, 48 Am. Rep. 459. The legislature may change laws except as to rights or interests that have already accrued or become perfected, and this applies to rights of action for negligence. Cooley, Const. Lim., p. 438; Blackstone's Commentaries, 431; *Martin v. Pittsburg etc. R. Co.*, *supra*; *Littleton v. Fowler*, 1 Salk. 282, 91 Eng. Rep. Reprint, 247; *Gray v. Portland Bank*, 3 Mass. 363; *Harlow v. Humiston*, 6 Cowen 189; *Munn v. Illinois*, 94 U. S. 113; *Vindicator Consol. Gold Min. Co. v. Firstbrook*, 36 Colo. 498, 86 Pac. 313; *Western Union Telegraph Co. v. Commercial Milling Co.*, 218 U. S. 406; *Templeton v. Linn County*, 22 Ore. 313, 29 Pac. 795, 15 L. R. A. 730; *Williams v. Galveston*, 41 Tex. Civ. App. 63, 90 S. W. 505; *Sawyer v. El Paso & N. E. R. Co.*, 49 Tex. Civ. App. 106, 108 S. W. 718; *Atchison etc. R. Co. v. Sowers*, 213 U. S. 55; *Bennet v. Hargus*, 1 Neb. 419. The statute is not unconstitutional as interfering with the right to contract. *Hooper v. California*, 155 U. S. 648; *Booth v. Illinois*, 184 U. S. 425; *Frisbie v.*

*United States*, 157 U. S. 160; *Barbier v. Connolly, Holden
v. Hardy, St. Louis etc. R. Co. v. Paul, State v. Buchanan,
Louisville & N. R. Co. v. Melton, Employers' Liability Cases,*
and *El Paso & N. E. R. Co. v. Gutierrez, supra; Knoxville
Iron Co. v. Harbison,* 183 U. S. 13. It does not deny the equal
protection of the laws; the hazardous nature of the occu-
pations justifies classification and discriminative legislation.
*Lindsley v. Natural Carbonic Gas Co.,* 220 U. S. 61; *Mis-
souri Pac. R. Co. v. Mackey,* 127 U. S. 205; *Minneapolis
& St. L. R. Co. v. Herrick,* 127 U. S. 210; *Chicago etc.
R. Co. v. Pontius,* 157 U. S. 209; *Callahan v. St. Louis
Merchants' Bridge Terminal R. Co.,* 170 Mo. 473, 71 S.
W. 208, 94 Am. St. 746, 60 L. R. A. 249; *Id.,* 175 U.
U. 348; *Ditberner v. Chicago, M. & St. P. R. Co.,* 47 Wis.
138, 2 N. W. 69; *Hancock v. Norfolk & W. R. Co.,* 124
N. C. 222, 32 S. E. 679; *Thompson v. Central R. &
Banking Co., Georgia Railroad v. Ivey,* and *Deppe v. Chi-
cago etc. R. Co., supra; Lavallee v. St. Paul, M. & M.
R. Co.,* 40 Minn. 249, 41 N. W. 974; *Pittsburgh etc. R.
Co. v. Montgomery,* 152 Ind. 1, 49 N. E. 582, 71 Am. St.
300, 69 L. R. A. 875; *Florida East Coast R. Co. v. Lassi-
ter,* 58 Fla. 234, 50 South. 428; *Schradin v. New York etc.
R. Co.,* 194 N. Y. 534, 87 N. E. 1126; *Wilmington Star
Min. Co. v. Fulton,* 205 U. S. 60; *St. Louis Consol. Coal Co.
v. Illinois,* 185 U. S. 203; *Tullis v. Lake Erie & W. R. Co.,*
175 U. S. 348; *Chicago, M. & St. P. R. Co. v. Westby,* 178
Fed. 619; *Louisville & N. R. Co. v. Melton, supra; Mis-
souri Pac. R. Co. v. Castle,* 172 Fed. 841; *Peirce v. Van
Dusen,* 78 Fed. 693; *El Paso & N. R. Co. v. Gutierrez, supra;
Indianapolis Traction & Terminal Co. v. Kinney,* 171 Ind.
612, 85 N. E. 954, 23 L. R. A. (N. S.) 711; *Mobile etc.
R. Co. v. Turnispeed,* 219 U. S. 35.   The constitutional pro-
vision that the right to trial by jury shall remain inviolate
applies only if there is to be a trial.   24 Cyc. 106; *Koppikus
v. State Capitol Com'rs,* 16 Cal. 248; *East Kingston v.
Towle,* 48 N. H. 57, 97 Am. Dec. 575; *Ives v. South Buffalo*

*R. Co.,* 68 Misc. 643, 124 N. Y. Supp. 920; *Id.,* 201 N. Y. 271, 94 N. E. 431; *People v. Hill,* 163 Ill. 186, 46 N. E. 796, 36 L. R. A. 634. The enforced contribution is not a tax that needs to be equal and uniform. *State v. Cassidy, supra; Baldwin v. Louisville & N. R. Co.,* 85 Ala. 619, 5 South. 311, 7 L. R. A. 266; *People v. Harper,* 91 Ill. 357; *Chicago, W. & V. Coal Co. v. People,* 181 Ill. 270, 54 N. E. 961, 48 L. R. A. 554; *Charlotte, C. & A. R. Co. v. Gibbes,* 27 S. C. 385, 4 S. E. 49; *Id.,* 142 U. S. 386; *Morgan's Steamship Co. v. Louisiana Board of Health,* 118 U. S. 455; *New Orleans v. Hop Lee,* 104 La. 601, 29 South. 214; *People v. Squire,* 107 N. Y. 593, 14 N. E. 820, 1 Am. St. 893; *McGlone v. Womack,* 33 Ky. Law 811, 111 S. W. 688, 17 L. R. A. (N. S.) 855; *Firemen's Benevolent Ass'n v. Lounsbury,* 21 Ill. 511, 74 Am. Dec. 115.

*Graves, Kizer & Graves,* for defendant, contended, among other things, that the act is unconstitutional. *Ives v. South Buffalo R. Co.,* 201 N. Y. 271, 94 N. E. 431. The liability cannot be imposed without reference to the negligence, act, or fault of the employer. *Ohio & M. R. Co. v. Lackey,* 78 Ill. 55, 20 Am. Rep. 259; *Louisville & N. R. Co. v. Baldwin,* 85 Ala. 619, 5 South. 311, 7 L. R. A. 266; *Gibbs v. Tally,* 133 Cal. 373, 65 Pac. 970, 60 L. R. A. 815; *Denver & R. G. R. Co. v. Outcalt,* 2 Colo. App. 395, 31 Pac. 177; *Jolliffe v. Brown,* 14 Wash. 155, 44 Pac. 149, 53 Am. St. 868; *Gulf, Colorado etc. R. Co. v. Ellis,* 165 U. S. 150; *Zeigler v. South & N. A. R. Co.,* 58 Ala. 594; *South & N. A. R. Co. v. Morris,* 65 Ala. 193; *Chicago etc. R. Co. v. Moss & Co.,* 60 Miss. 641; *Birmingham Mineral R. Co. v. Parsons,* 100 Ala. 662, 13 South. 602, 46 Am. St. 92, 27 L. R. A. 263; *Jensen v. Union Pac. R. Co.,* 6 Utah 253, 21 Pac. 994, 4 L. R. A. 724; *Bielenberg v. Montana Union R. Co.,* 8 Mont. 271, 20 Pac. 314, 2 L. R. A. 813; *The Nitro-glycerine Case,* 82 U. S. 524; *Bennett v. Ford,* 47 Ind. 264; *Browne v. Collins,* 53 N. H. 442, 16 Am. Rep.

372; *Lewis v. Flint & P. M. R. Co.*, 54 Mich. 55, 19 N. W. 744, 52 Am. Rep. 790; *Steffen v. Chicago & N. W. R. Co.*, 46 Wis. 259, 50 N. W. 348. State insurance of this character is not a reasonable exercise of the police power. *Lawton v. Steele*, 152 U. S. 133; *Ballard v. Mississippi Cotton Oil Co.*, 81 Miss. 507, 34 South. 533, 95 Am. St. 476, 62 L. R. A. 470; *Indianapolis Traction & Terminal Co. v. Kinney*, 171 Ind. 612, 85 N. E. 954; *Cleveland etc. R. Co. v. Foland* (Ind.), 91 N. E. 594; *Id.* (Ind.), 92 N. E. 165; *Chicago, M. & St. P. R. Co. v. Westby*, 178 Fed. 619. The act imposes taxes for other than public purposes. Cooley, Taxation (2d ed.), 103; *Loan Association v. Topeka*, 20 Wall. 655; *Feldman v. City Council of Charleston*, 23 S. C. 57, 55 Am. Rep. 6; *People ex rel. Detroit etc. R. Co. v. Township Board of Salem*, 20 Mich. 452, 4 Am. Rep. 400; *Opinion of Justices*, 155 Mass. 598, 30 N. E. 1142, 15 L. R. A. 809; *Deering & Co. v. Peterson*, 75 Minn. 118, 77 N. W. 568; *Lowell v. Boston*, 111 Mass. 454, 15 Am. Rep. 39; *Patty v. Colgan*, 97 Cal. 251, 31 Pac. 1133, 18 L. R. A. 744; *Wisconsin Keeley Co. v. Milwaukee County*, 95 Wis. 153, 70 N. W. 68, 60 Am. St. 105, 36 L. R. A. 55; *State ex rel. Garrett v. Froehlich*, 118 Wis. 129, 94 N. W. 50, 99 Am. St. 985, 61 L. R. A. 345; *State ex rel. Garth v. Switzler*, 143 Mo. 287, 45 S. W. 245, 65 Am. St. 653, 40 L. R. A. 280; *Auditor of Lucas County v. State ex rel. Boyles*, 75 Ohio St. 114, 78 N. E. 955, 7 L. R. A. (N. S.) 1196; *Kingman v. Brockton*, 153 Mass. 255, 26 N. E. 998, 11 L. R. A. 123; *Mead v. Acton*, 139 Mass. 341, 1 N. E. 413; *Weismer v. Village of Douglas*, 64 N. Y. 91, 21 Am. Rep. 586; *Baker v. Grand Rapids*, 142 Mich. 687, 106 N. W. 208; *City of Geneseo v. Geneseo Natural Gas etc. Co.*, 55 Kan. 358, 40 Pac. 655; *Opinion of Justices*, 204 Mass. 607, 91 N. E. 405, 27 L. R. A. (N. S.) 483. The act is not a proper exercise of the police power because not reasonably necessary to attain the result desired. *Lawton v. Steele*, *supra*; *Colon v. Lisk*, 153 N. Y. 188, 47 N. E. 302, 60

Am. St. 609; *California Reduction Co. v. Sanitary Reduction Works*, 126 Fed. 29; *Republic Iron & Steel Co. v. State*, 160 Ind. 379, 66 N. E. 1005, 62 L. R. A. 136; *State v. Dalton*, 22 R. I. 77, 46 Atl. 234, 84 Am. St. 818, 48 L. R. A. 775; *State v. Redmon*, 134 Wis. 89, 114 N. W. 137, 126 Am. St. 1003, 14 L. R. A. (N. S.) 229; *In re Aubrey*, 36 Wash. 308, 78 Pac. 900, 104 Am. St. 952; *State v. Brown*, 37 Wash. 97, 79 Pac. 635, 107 Am. St. 798, 68 L. R. A. 889; *State ex rel. Richey v. Smith*, 42 Wash. 237, 84 Pac. 851, 114 Am. St. 114, 5 L. R. A. (N. S.) 674.

*Denman & Fishburne*, for defendant, contended, *inter alia*, that the right of trial by jury shall remain inviolate means that "the right is preserved in substance as it existed at the time of the adoption of the constitution in the classes of cases to which it was then applicable." 6 Am. &.Eng. Ency. Law (2d ed.), p. 974; *State ex rel. Clark v. Neterer*, 33 Wash. 535, 74 Pac. 668; *Dacres v. Oregon R. & Nav. Co.*, 1 Wash. 525, 20 Pac. 601; *State ex rel. Mullen v. Doherty*, 16 Wash. 382, 47 Pac. 958, 58 Am. St. 39; *Flint River Steamboat Co. v. Roberts*, 2 Fla. 102, 48 Am. Dec. 178. At the time of the adoption of the constitution, the right to trial by jury was guaranteed in assessments for damages from negligence. *Dacres v. Oregon R. & Nav. Co., supra; Montana Ore Purchasing Co. v. Boston & M. etc. Min. Co.*, 27 Mont. 536, 71 Pac. 1005; *Chessman v. Hale*, 31 Mont. 577, 79 Pac. 254, 68 L. R. A. 410; *Bradford v. Territory*, 1 Oklh. 366, 34 Pac. 66; *Parsons v. Bedford etc.*, 3 Pet. (U. S.) 433; *Town of East Kingston v. Towle*, 48 N. H. 57, 97 Am. Dec. 575, 2 Am. Rep. 174; *Ives v. South Buffalo R. Co.*, 201 N. Y. 271, 94 N. E. 431; *Graves v. Northern Pac. R. Co.*, 5 Mont. 556, 6 Pac. 16, 51 Am. Rep. 81; *Fairchild v. Rich*, 68 Vt. 202, 34 Atl. 692. The legislature cannot, by giving an equitable form to a legal action, deprive the parties of a trial by jury. 6 Am. & Eng. Ency. Law (2d ed.), 977; *North Pennsylvania Coal Co. v. Snowden*,

42 Pa. St. 488, 82 Am. Dec. 530. To give the decision of
a department the force of *prima facie* evidence is to deprive
a man of the right to trial by jury in its true sense. *Plimp-
ton v. Town of Somerset*, 33 Vt. 283; *King v. Hopkins*, 57
N. H. 334. The employer, also, has the right to a jury
trial. *Plimpton v. Town of Somerset, supra; Wynehamer
v. People*, 13 N. Y. 378; *People v. Kennedy*, 2 Park. (N. Y.
Cr.) 312. The phrase "due process" is equivalent to the
phrase "law of the land." Magna Charta, 9 Hen., III A. D.
1225; *Murray v. Hoboken Land & Imp. Co.*, 18 How. 272;
*Davidson v. New Orleans*, 96 U. S. 97. It means a law that
hears before it condemns, proceeds upon inquiry, and renders
judgment only after trial; law in the general course of ad-
ministration through courts of justice. 8 Cyc. 1081, foot-
note 58; *Ex parte Wall*, 107 U. S. 265, 289; *Hovey v.
Elliott*, 167 U. S. 409; *Holden v. Hardy*, 169 U. S. 366;
*Zeigler v. South & N. A. R. Co.*, 58 Ala. 594; *Ives v. South
Buffalo R. Co., supra; Jensen v. Union Pac. R. Co.*, 6 Utah
253, 21 Pac. 994, 4 L. R. A. 724. The act deprives the
citizen of liberty and property without due process of law.
8 Cyc. 1094; *In re Aubrey*, 36 Wash. 308, 78 Pac. 900, 104
Am. St. 952; *State v. Brown*, 37 Wash. 97, 79 Pac. 635,
107 Am. St. 798, 68 L. R. A. 889; *Ives v. South Buffalo
R. Co., supra*. No civil liability can be imposed upon a man
who is not himself at fault. *Oregon R. & Nav. Co. v. Smal-
ley*, 1 Wash. 206, 23 Pac. 1008, 22 Am. St. 143; *Jolliffe v.
Brown*, 14 Wash. 155, 44 Pac. 149, 53 Am. St. 868; *Zieg-
ler v. South & N. A. R. Co.*, and *Jensen v. Union Pac. R.
Co., supra; Bielenberg v. Montana Union R. Co.*, 8 Mont.
271, 20 Pac. 314, 2 L. R. A. 813; *Catril v. Union Pac. R.
Co.*, 2 Idaho 576, 21 Pac. 416; *Atchison & N. R. Co. v.
Baty*, 6 Neb. 37, 29 Am. Rep. 356; *South & N. A. R. Co.
v. Morris*, 65 Ala. 193; *Denver & R. G. R. Co. v. Outcalt*,
2 Colo. App. 395, 31 Pac. 177; *Denver & R. G. R. Co. v.
Davidson*, 2 Colo. App. 443, 31 Pac. 181; *Wadsworth v.
Union Pac. R. Co.*, 18 Colo. 600, 33 Pac. 515, 36 Am. St.

309, 23 L. R. A. 812; *Union Pac. R. Co. v. Kerr*, 19 Colo. 273, 35 Pac. 47; *Rio Grande Western R. Co. v. Vaughn*, 3 Colo. App. 465, 34 Pac. 264; *Rio Grande Western R. Co. v. Chamberlin*, 4 Colo. App. 149, 34 Pac. 1113; *Rio Grande Western R. Co. v. Whitson*, 4 Colo. App. 426, 36 Pac. 159; *Thompson v. Northern Pac. R. Co.*, 8 Mont. 279, 21 Pac. 25; *Ohio & M. R. Co. v. Lackey*, 78 Ill. 55, 20 Am. Rep. 259.

FULLERTON, J.—This is an original proceeding in mandamus, brought by the relator to compel the state auditor to issue a warrant on the state treasurer in payment of an obligation incurred by the industrial insurance department. The application was in the form required by the statute governing the practice in such cases, and sets forth facts which, on their face, show that the applicant is entitled to the warrant demanded. The auditor demurred generally to the application, and at the hearing his counsel argued that the act purporting to authorize the expenditure for which the warrant was demanded was unconstitutional and void.

It was suggested at the argument that the question of the constitutionality of the act could not be raised by the auditor in this form of proceeding, but to do so is in accord with the practice in this state. In *State ex rel. Olmstead v. Mudgett*, 21 Wash. 99, 57 Pac. 351, the relator sought by mandamus to compel the county treasurer of Spokane to collect an assessment levied to pay the cost of a street improvement, and on the demurrer of the treasurer to the application for the writ, we inquired into the constitutionality of the act authorizing the assessment to be made. To the same effect are *State ex rel. Port Townsend v. Clausen*, 40 Wash. 95, 82 Pac. 187, and *Hindman v. Boyd*, 42 Wash. 17, 84 Pac. 609. In the latter case it was acknowledged that the authorities on the question were in conflict, but it was said that the preferable rule was with the cases holding that the question could be thus raised. On principle the ruling seems to be sound. If it be true that an act of the legislature

authorizing the disbursement of public money is unconstitu-
tional, to inquire into it on the objection of an officer having
in charge such disbursement may save an expenditure that
would be otherwise lost to the state were the court to await
the suggestion of the question by some private litigant in-
juriously affected by the act.   There is no merit in the ob-
jection that the officer is without interest in the proceeding.
He is charged with the duty of conserving the public funds,
and consequently must be held to have an interest in any
proceeding which directly tends to that end.

The act thought to be unconstitutional by the auditor is
the act of the legislature of March 14, 1911, commonly
known as the workmen's compensation act.   Laws 1911,
page 345.   The act is of too great length to be set forth
here in full, but the following epitome of its several provis-
ions will give an understanding of its salient features, and
of the questions involved on this hearing.

Section 1 contains a declaration of the policy of the act.
It recites that the common law system governing remedies
of workmen against employers for injuries received in haz-
ardous employments are inconsistent with modern industrial
conditions; that in practice such remedies have proven eco-
nomically unwise and unfair; that their administration has
produced the result that little of the cost thereof to the em-
ployer has reached the workmen—and that little, only at a
great expense to the public; that the remedy to the individ-
ual workman is uncertain, slow and inadequate; that injuries
in such employments formerly occasional have become fre-
quent and inevitable; that the welfare of the state depends
upon its industries, and even more upon the welfare of its
wage workers; and it thereupon declares that the state of
Washington, exercising its sovereign powers, withdraws all
phases of the premises from private controversies and pro-
vides sure and certain relief for workmen injured in extra
hazardous work, and their families and dependents, regard-
less of questions of fault, to the exclusion of "every other

remedy, proceeding or compensation, except as otherwise
provided in this act." It thereupon abolishes civil actions
and civil causes of action for personal injuries incurred in
extra hazardous employments, and the jurisdiction of the
courts thereover, except as in the act provided.

Section 2 enumerates what the legislature deems extra haz-
ardous employments. It is provided, however, that if there
be found to be, or if there subsequently arises, any hazardous
employments not enumerated, the same shall nevertheless
come within the provisions of the act, and the rate of contri-
bution to the accident fund to be exacted from such employ-
ments shall be fixed by the department therein created until
the legislature itself shall have acted thereon. The enumera-
tion includes all classes of business and employments in
which machinery is employed, whether conducted by corpora-
tions or by individuals, and whether they are affected with a
public interest or are purely of a private nature.

Section 3 defines certain of the words and terms used in
the act. Concerning the word workman, is the following:

"Workman means every person in this state, who, after
September 30, 1911, is engaged in the employment of an em-
ployer carrying on or conducting any of the industries
scheduled or classified in section 4, whether by way of manual
labor or otherwise, and whether upon the premises or at the
plant or, he being in the course of his employment, away from
the plant of his employer: Provided, however, That if the
injury to a workman occurring away from the plant of his
employer is due to the negligence or wrong of another not
in the same employ, the injured workman, or if death result
from the injury, his widow, children, or dependents, as the
case may be, shall elect whether to take under this act or seek
a remedy against such other, such election to be in advance
of any suit under this section; and if he take under this act,
the cause of action against such other shall be assigned to
the state for the benefit of the accident fund; if the other
choice is made, the accident fund shall contribute only the
deficiency, if any, between the amount of recovery against
such third person actually collected, and the compensation
provided or estimated by this act for such case. Any such

cause of action assigned to the state may be prosecuted, or compromised by the department, in its discretion. Any compromise by the workman of any such suit, which would leave a deficiency to be made good out of the accident fund, may be made only with the written approval of the department.

"Any individual employer or any member or officer of any corporate employer who shall be carried upon the pay roll at a salary or wage not less than the average salary or wage named in such pay roll and who shall be injured, shall be entitled to the benefit of this act as and under the same circumstances as and subject to the same obligations as a workman."

Section 4 contains a schedule of contributions. It recites that, in so much as industry should bear the greater proportion of the burden of the costs of its accidents, each employer shall, prior to January 15 of each year, pay into the state treasury, in accordance with a schedule provided, a sum equal to a percentage of his total pay roll of that year. Then follows a classification of the different industries and the rate per centum each several class shall be required to pay, the amounts varying as the legislature deemed the risk of injury therefrom varied, the greater hazard contributing the larger percentage. The fund created is termed the accident fund, and it is provided that it shall be devoted exclusively to the purposes specified in the act. A scheme is provided for replenishing the fund in case an amount collected shall be insufficient to meet the demands upon it. It is also provided:

"If a single establishment or work comprises several occupations listed in this section in different risk classes, the premium shall be computed according to the pay roll of each occupation if clearly separable; otherwise an average rate of premium shall be charged for the entire establishment, taking into consideration the number of employees and the relative hazards. If an employer besides employing workmen in extra hazardous employment shall also employ workmen in employments not extra hazardous the provisions of this act shall apply only to the extra hazardous departments and employments and the workmen employed therein. In computing

the pay roll the entire compensation received by every work-
man employed in extra hazardous employment shall be in-
cluded, whether it be in form of salary, wage, piece work,
overtime, or any allowance in the way of profit-sharing,
premium or otherwise, and whether payable in money, board,
or otherwise."

Section 5 contains the compensation schedule. It pro-
vides that each workman who shall be injured, whether upon
the premises or at the plant, or being in the course of his em-
ployment away from the plant of his employer, or his family
or dependents in case of the death of the workman, shall re-
ceive out of the accident fund compensation in accordance
with the schedule provided, and except as in the act other-
wise provided such compensation shall be in lieu of any and
all rights of action whatsoever against any person whomso-
ever. This schedule provides for monthly payments to de-
pendents of the workman in case the injury results in death,
varying according to their number and degree of relation-
ship, and to the workman direct in case the injury results
only in disability, the amount varying according to the pro-
portion the extent of such disability bears to a fixed maximum.

Section 6 relates to intentional injuries and the status of
minors engaged in hazardous employments. It is provided
that, if injury or death results to a workman from the delib-
erate intention of the workman himself to produce such in-
jury or death, no compensation shall be made either to the
workman or his dependents out of the accident fund. If,
however, the injury or death results to a workman from the
deliberate intention of his employer, such workman, or in
case of his death, a widow, widower, child, or dependent of the
workman, shall have the privilege to take under the act; and
shall also have a cause of action against the employer, as if
the act had not been enacted, for any excess of damage over
the amount received, if receivable under the act. A minor
working at an age legally permitted under the laws of the
state shall be deemed *sui juris* for the purposes of the act,

and no other person shall have any cause of action or right to compensation for his injury.

Section 7 provides for converting the monthly payments into corresponding lump sums according to the American mortality tables.    Section 8 provides penalties for defaulting employers.    Section 9 relates to injuries caused by the absence of safeguards required by statute.    Section 10 exempts awards made under it from assignment, or from seizure under legal proceedings.

Section 11 provides that no employer of workmen shall exempt himself from the burden or waive the benefits of the act by any contract, agreement, rule or regulation, and that any such contract, agreement, rule or regulation shall be *pro tanto* void.

Section 12 relates to the filing of claims; section 13, to medical examinations; section 14, to the notice required of the happening of accidents; and section 15, to an inspection of any employer's books.    Section 16 provides a penalty for misrepresentation as to the amount of the pay roll.    Section 17 relates to public contract work.    Section 18 contains provisions relating to interstate and intrastate commerce; and section 19 provides that the provisions of the act may be adopted by employers and employees engaged in nonhazardous employments.

Section 20 relates to court reviews.    It provides that any employer, workman, beneficiary, or person feeling aggrieved at any decision of the department created to administer the terms of the act affecting his interest may have the same reviewed by a proceeding for that purpose in the nature of an appeal, initiated in the superior court of the county of his residence, in so far as such decision rests upon questions of fact or of the proper application of the provisions of the act; "it being the intent that matters resting in the discretion of the department shall not be subject to review."    It is provided further that the appeal shall be informal and summary. No bond shall be required, and any decision of the superior

court may be referred to the supreme court for review, according to existing laws applicable to other civil causes. The calling of a jury is within the discretion of the court, except that, in cases occurring under sections 9, 15, and 16 of the act, each party shall be entitled to a trial by jury on demand.

Section 21 vests the administration of the act in a department to be known as the "Industrial Insurance Department," to consist of three commissioners, to be appointed by the governor. It is provided that a decision of any question arising under the act, concurred in by two commissioners, shall be deemed the decision of the department, and each member thereof is given power to issue subpoenas requiring the attendance of witnesses and the production of books and documents.

Section 22 relates to the salary of the commissioners, and section 23 to the appointment of deputies and assistants. Section 24 further defines the duties of the commissioners in relation to the administration of the act. Section 25 relates to medical examinations, and section 26 to the manner in which funds appropriated to the use of the department shall be disbursed.

Section 27 provides:

"If any employer shall be adjudicated to be outside the lawful scope of this act, the act shall not apply to him or his workman, or if any workman shall be adjudicated to be outside the lawful scope of this act because of remoteness of his work from the hazard of his employer's work, any such adjudication shall not impair the validity of this act in other respects, and in every such case an accounting in accordance with the justice of the case shall be had of moneys received. If the provisions of section 4 of this act for the creation of the accident fund, or the provisions of this act making the compensation to the workman provided in it exclusive of any other remedy on the part of the workman shall be held invalid the entire act shall be thereby invalidated except the provisions of section 31, and an accounting according to the justice of the case shall be had of moneys received. In other respects an adjudication of invalidity of any part of this act

shall not affect the validity of the act as a whole or any other part thereof."

Section 29 appropriates out of the general fund in the state treasury the sum of $150,000, to be known as an administration fund, out of which the salaries, traveling, and office expenses of the department shall be paid, together with · all the expenses of administration of the accident fund; and out of the accident fund is appropriated $1,500,000 to be applied to the purposes for which such fund is applicable.    The remaining sections relate to the administration, and define and limit the effect and operation of the act, and need no special reference to their contents.

The foregoing summary makes clear the theory and purpose of the act.    It is founded on the basic principle that certain defined industries, called in the act extra hazardous, should be made to bear the financial losses sustained by the workmen engaged therein through personal injuries, and its purpose is to furnish a remedy that will reach every injury sustained by a workman engaged in any of such industries, and make a sure and certain award therefor, bearing a just proportion to the loss sustained, regardless of the manner in which the injury was received.    With the economic questions thus suggested, the auditor's learned counsel object only to the wisdom of the scheme formulated.    They concede that the evil is one calling for a remedy, and direct their arguments solely against the constitutionality of the scheme adopted.    In our discussion we shall confine ourselves to the question thus suggested, noticing the economic question only incidentally.

The act is challenged as unconstitutional on four distinct grounds:    (1) That it violates section 3, of article 1, of the state constitution, and the fourteenth amendment to the constitution of the United States, which provide that no person shall be deprived of life, liberty, or property without due process of law; (2) that it violates section 12, of article 1, of the state constitution, which provides that no law shall be

passed granting to any citizen, class of citizens, or corpora-
tions, other than municipal, privileges or immunities which,
upon the same terms, shall not equally belong to all citizens
or corporations; and the fourteenth amendment to the consti-
tution of the United States, which provides for the equal pro-
tection of the laws; (3) that it violates sections 1 and 2, of
article 7, of the state constitution, which provide that prop-
erty shall be taxed according to its value in money and that
all taxation shall be equal and uniform; and (4) that it vio-
lates section 21, of article 1, of the state constitution which
provides that the right of trial by jury shall remain inviolate.
But while we shall discuss the questions suggested under the
several divisions as here set out, it is obvious that no very log-
ical segregation of the argument can be thus made, as many
of the reasons advanced for or against the act under one par-
ticular division are equally applicable to one or more of the
others.    Any different arrangement, however, seems to be at
the sacrifice of clearness, and we pass therefore directly to the
first objection stated.

It is with regret that we are unable to set forth at length
counsel's argument on this branch of the case, as any abbre-
viation of it is at the expense of its cogency and force.    To
do so, however, would unduly lengthen this opinion.    The ar-
gument is based on two fundamental ideas:    The one, that
the act creates a liability without fault; and the other, that it
takes the property of one employer to pay the obligations of
another.    It must be conceded that these contentions have a
basis in fact, and that they, on first impression, constitute a
persuasive argument against the validity of the act.    Since
there is exacted from every employer of labor engaged in one
or more of the industries termed hazardous a certain fixed
sum based upon his pay roll, which is to be used to compen-
sate employees working in such hazardous employments who
receive personal injuries, regardless of the question whether
the injury was because of the fault of the employer or of the
negligence of the employee, it can be said that some part of

the sum so collected will be paid out on injuries in which the
employer is without fault; and, furthermore, since every such
employer is liable to make the payments whether or not any
of his own workmen are injured, and since an employer is liable
under the common law for an injury to his own workmen only,
it can also be said that by this act one employer is held liable
for the obligations of another.

But these conditions do not furnish an absolute test of the
validity of the act.   In the statute books of the several states
are many statutes held constitutional by the courts where
liability is created without fault, and where the property of
one person is taken to pay the obligations of another, and
this where no compensation is made to the person who is thus
made liable or whose property is thus taken, other than per-
haps the bestowal upon him of some privilege.   The test of
the validity of such a law is not found in the inquiry, Does it
do the objectionable things? but is found rather in the in-
quiry, Is there no reasonable ground to believe that the public
safety, health or general welfare is promoted thereby?   The
legislature cannot, of course, without violating this clause of
the constitution, declare a particular industry, commonly en-
gaged in by the people, to be unlawful which, under all cir-
cumstances, must necessarily be harmless and innocent; but it
can regulate and control and prohibit any industry, however
innocent it may have been in its inception, whenever it be-
comes a menace to the employees engaged in it, the people sur-
rounding it, or to any considerable number of the people at
large, no matter from whatsoever cause the menace may arise.
This it does under the police power: "the power inherent in
every sovereignty . . . the power to govern men and
things."

It is unnecessary to discuss the origin, nature or extent of
this power.   It is sufficient to say that, by means of it, the
legislature exercises a supervision over matters affecting the
commonweal and enforces the observance by each individual
member of society of duties which he owes to others and the

community at large.   The possession and enjoyment of all
rights are subject to this power.   Under it, the state may
"prescribe regulations promoting the health, peace, morals,
education and good order of the people, and to legislate so as
to increase the industries of the state, develop its resources,
and add to its welfare and prosperity."   In fine, when re-
duced to its ultimate and final analysis, the police power is the
power to govern.   It is not meant here to be asserted that
this power is above the constitution, or that everything done
in the name of the police power is lawfully done.   It is meant
only to be asserted that a law which interferes with personal
and property rights is valid only when it tends reasonably to
correct some existing evil or promote some interest of the
state, and is not in violation of any direct and positive man-
date of the constitution.   The clause of the constitution now
under consideration was intended to prevent the arbitrary ex-
ercise of power, or undue, unjust, and capricious interference
with personal rights ; not to prevent those reasonable regula-
tions that all must submit to as a condition of remaining a
member of society.   In other words, the test of a police regu-
lation, when measured by this clause of the constitution, is
reasonableness, as contradistinguished from arbitrary or ca-
pricious action.

The authorities, as we view them, abundantly support the
foregoing principles.   Of statutes upheld by the court which
can be said to create liability without fault and take the
property of one person to pay the obligations of another, the
most conspicuous examples are, perhaps, sections 4585 and
4803 of the Revised Statutes of the United States, which pro-
vide:

"Sec. 4585.   There shall be assessed and collected by the
collector of customs at the ports of the United States, from
the master or owner of every vessel of the United States ar-
riving from a foreign port, or of every registered vessel em-
ployed in the coasting trade, and before such vessel shall be
admitted to entry, the sum of forty cents per month for each
and every seaman who shall have been employed on such ves-

sel since she was last entered at any port of the United States;
such sum such master or owner may collect and retain from
the wages of such seamen."

"Sec. 4803.   The several collectors of the customs shall
respectively deposit, without abatement or reduction, the sums
collected by them under the provisions of law imposing a tax
upon seamen for hospital purposes, with the nearest depos-
itary of public moneys, and shall make returns of the same,
with proper vouchers, monthly, to the Secretary of the Treas-
ury, upon forms to be furnished by him.   All such moneys
shall be placed to the credit of 'the fund for the relief of sick
and disabled seamen;' of which fund separate accounts shall
be kept in the treasury.   Such fund is appropriated for the
expenses of the marine-hospital service, and shall be employed,
under the direction of the Secretary of the Treasury, for the
care and relief of sick and disabled seamen employed in regis-
tered, enrolled, and licensed vessels of the United States."

This statute clearly does everything that is charged against
the statute at bar.   It creates liability without fault, since it
obligates the master or owner of every vessel of the United
States to pay into a given fund, controlled by the government,
a fixed sum for the benefit of sick and disabled seamen, re-
gardless of the fact whether or not the vessel of the master or
owner making the payment has any sick or disabled seamen
who take advantage of the fund; and it takes the property of
one to pay the obligations of another, since the fund is dis-
bursed in the cure of sick and disabled American seamen gen-
erally, regardless of the fact whether or not the expense of
their cure exceeds the sum paid in by the master or owner of
the vessel from which they came.   Whatever may be said as to
the foundation of the liability of the master or the owner of a
vessel, or the vessel itself, to answer for the expenses of the
cure of sick and disabled seamen while in service on the ship,
the foundation of this liability is purely statutory; and, if
the objection that is made to the present statute were suffi-
cient to condemn it, the statute is in violation of the fifth
amendment to the constitution of the United States.   The
statute had its inception in the act of Congress of July 16,

1798 (1 Stats. at Large, 606), and was on the statute books for nearly one hundred years, during which time it was continuously enforced. It is true our attention has been called to no case where the statute was directly attacked; but there are numerous cases in which it has been specifically mentioned and given force, and it would seem that, if it were thought inimical to the constitution, it would not have escaped the attention of the astute counsel whose client's interests were adversely affected by it. *Buckley v. Brown*, Fed. Case, No. 2,092; *Reed v. Canfield*, Fed. Case, No. 11,641; *Peterson v. The Chandos*, 4 Fed. 645; *Holt v. Cummings*, 102 Pa. St. 212, 48 Am. Rep. 199. See, also, 3 Opinions of Attorneys General (U. S.) 683; 13 Opinions of Attorneys General (U. S.) 330.

Statutes making railroad corporations absolutely liable, without regard to negligence, for injuries to property caused by fires escaping from their locomotive engines, are clearly statutes creating liability without fault, yet these statutes have been upheld by all the courts of the states in which they have been enacted, as well as by the supreme court of the United States. *Chapman v. Atlantic & St. Lawrence R. Co.*, 37 Me. 92; *Sherman v. Maine Cent. R. Co.*, 86 Me. 422, 30 Atl. 69; *Hooksett v. Concord R.*, 38 N. H. 242; *Smith v. Boston & Maine R.*, 63 N. H. 25; *Lyman v. Boston & Worcester R. Corp.*, 4 Cush. 288; *Pierce v. Worcester & Nashua R. Co.*, 105 Mass. 199; *Rodemacher v. Milwaukee & St. P. R. Co.*, 41 Iowa 297, 20 Am. Rep. 592; *Mathews v. St. Louis & San Francisco R. Co.*, 121 Mo. 298, 24 S. W. 591, 25 L. R. A. 161; *Emerson v. Gardiner*, 8 Kan. 452; *Jensen v. South Dakota Cent. R. Co.*, 25 S. D. 506, 127 N. W. 650; *St. Louis & San Francisco R. Co. v. Mathews*, 165 U. S. 1; *Atchison, T. & S. F. R. Co. v. Matthews*, 174 U. S. 96.

Other statutes are those providing that any landlord who knowingly leases his premises for saloon purposes shall be liable for losses resulting from intoxication caused by the sale of liquor by his lessee. Such a statute was formerly in force

in this state, and was given effect by this court. *Delfel v. Hanson,* 2 Wash. 194, 26 Pac. 220; *Burkman v. Jamieson,* 25 Wash. 606, 66 Pac. 48.   And in *Bertholf v. O'Reilly,* 74 N. Y. 509, 30 Am. Rep. 323, the constitutionality of a like statute was maintained in an opinion by Judge Andrews, renowned for his ability and learning.   In the course of his opinion, the learned judge noted the fact that the liability of the landlord could not be sustained on the theory that such liability was a condition of a privilege granted by the statute, but rested the decision on the principle that the state, under its police power, could impose upon the landlord liability for the acts of his tenants.   In the course of the opinion this language was used:

"And the act of 1873 is not invalid because it creates a right of action and imposes a liability not known to the common law.   There is no such limit to legislative power.   The legislature may alter or repeal the common law.   It may create new offenses, enlarge the scope of civil remedies, and fasten responsibility for injuries upon persons against whom the common law gives no remedy.   We do not mean that the legislature may impose upon one man liability for an injury suffered by another, with which he had no connection.   But it may change the rule of the common law, which looks only to the proximate cause of the mischief, in attaching legal responsibility, and allow a recovery to be had against those whose acts contributed, although remotely, to produce it. . . .

"The liability imposed upon the landlord for the acts of the tenant is not a new principle in legislation.   His liability only arises when he has consented that the premises may be used as a place for the sale of liquors.   He selects the tenant, and he may, without violating any constitutional provision, be made responsible for the tenant's acts, connected with the use of the leased property."

Statutes imposing a liability upon fire insurance agents, based upon the amount of the insurance effected by them, for the benefit of a fund to care for and cure sick and injured firemen, have been upheld in the states of New York and Illinois. *Fire Department v. Noble,* 3 E. D. Smith (N. Y.) 440; *Fire*

*Department v. Wright*, 3 E. D. Smith (N. Y.) 453; *Exempt Fireman's Fund v. Roome*, 29 Hun 391, 394; *Firemen's Benevolent Ass'n v. Lounsbury*, 21 Ill. 511, 74 Am. Dec. 115. Clearly these are statutes creating liability without fault. A similar statute relating to agents of foreign fire insurance companies was upheld in Wisconsin. *Fire Department v. Helfenstein*, 16 Wis. 136.

The statute of Nebraska makes a railroad company liable in damages for injuries sustained by a passenger regardless of the question of negligence on the part of the company, except where the injury is caused by the passenger's criminal negligence, or by his violation of some express rule of the company, actually brought to his attention. This statute was upheld against a challenge on the ground that it violated the due process of law clauses of the state and Federal constitutions, by the state court, in *Chicago, R. I. etc. R. Co. v. Zernecke*, 59 Neb. 689, 82 N. W. 26, 55 L. R. A. 610, and by the supreme court of the United States in *Chicago, R. I. etc. R. Co. v. Zernecke*, 183 U. S. 582. The supreme court of the United States, vindicating the statute against the attack made upon it, used the following language:

"In *Omaha & R. V. R. Co. v. Chollette*, 33 Neb. 143, the words of the statute exempting railroad companies from liability, 'where the injury done arose from the criminal negligence of the persons injured,' were defined to mean 'gross negligence,' 'such negligence as would amount to a flagrant and reckless disregard' by the passenger of his own safety, and 'amount to a willful indifference to the injury liable to follow.' This definition was approved in subsequent cases. It was also approved in the case at bar, and the plaintiff in error, it was in effect declared, was precluded from any defense but that of negligence as defined, or that the injury resulted from the violation of some rule of the company by the passenger brought to his actual notice, and the company, as we have said, was not permitted to introduce evidence that the derailment of its train was caused by the felonious act of a third person. The statute, thus interpreted and enforced, it is asserted, impairs the constitutional rights of plaintiff in error.

The specific contention is that the company is deprived of its defense, and not only declared guilty of negligence and wrongdoing without a hearing, but, adjudged to suffer without wrongdoing, indeed even for the crimes of others, which the company could not have foreseen or have prevented.

"Thus described, the statute seems objectionable. Regarded as extending the rule of liability for injury to persons which the common law makes for the loss of or injury to things, the statute seems defensible. And it was upon this ground that the supreme court of the state defended and vindicated the statute. The court said:

" 'The legislation is justifiable under the police power of the state, so it has been held. It was enacted to make railroad companies insurers of the safe transportation of their passengers as they were of baggage and freight; and no good reason is suggested why a railroad company should be released from liability for injuries received by a passenger while being transported over its line, while the corporation must respond for any damages to his baggage or freight.'

"Our jurisprudence affords examples of legal liability without fault, and the deprivation of property without fault being attributable to its owner. The law of deodands was such an example. The personification of the ship in admiralty law is another. Other examples are afforded in the liability of the husband for the torts of the wife—the liability of a master for the acts of his servants.

"In *Missouri Railway Co. v. Mackey*, 127 U. S. 205, a statute of Kansas abrogating the common law rule exempting a master from liability to a servant for the negligence of a fellow-servant, was sustained against the contention that such statute violated the fourteenth amendment of the constitution of the United States. And in *Minneapolis etc. Railway Co. v. Herrick*, 127 U. S. 210, a statute of Iowa which extended liability for the *'wilful wrongs,' whether of commission or omission,'* of the 'agents, engineers or other employees' of railroad companies, was vindicated against the double attack of being an unjust discrimination against railroad corporations and the deprivation of property without due process of law."

The latest illustration of such a statute is found in the Oklahoma depositors guaranty law, which authorizes the assessment and collection of a certain per centum on the daily

average deposit of each and every bank organized under the laws of the state as a fund to pay the losses caused depositors by failing and insolvent banks.   This act was challenged in the state court on the ground that it violated the fourteenth amendment to the constitution of the United States, and the due process of law clause of the state constitution; but was upheld by the state court, and on writ of error to the supreme court of the United States, the judgment of the state court was affirmed.   *Noble State Bank v. Haskell*, 22 Okl. 48, 97 Pac. 590; *Noble State Bank v. Haskell*, 219 U. S. 104.   Answering the objection that the act takes private property for a private use, and creates a liability without fault, the supreme court of the United States said:

"The substance of the plaintiff's argument is that the assessment takes private property for private use without compensation.   And while we should assume that the plaintiff would retain a reversionary interest in its contribution to the fund so as to be entitled to a return of what remained of it if the purpose were given up (see *Receiver of Danby Bank v. State Treasurer*, 39 Vt. 92, 98), still there is no denying that by this law a portion of its property might be taken without return to pay debts of a failing rival in business. Nevertheless, notwithstanding the logical form of the objection, there are more powerful considerations on the other side. In the first place it is established by a series of cases that an ulterior public advantage may justify a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use.   *Clark v. Nash*, 198 U. S. 361; *Strickley v. Highland Boy Mining Co.*, 200 U. S. 527, 361; *Offield v. New York, New Haven & Hartford R. R. Co.*, 203 U. S. 372; *Bacon v. Walker*, 204 U. S. 311, 315.   And in the next, it would seem that there may be other cases beside the every day one of taxation, in which the share of each party in the benefit of a scheme of mutual protection is sufficient compensation for the correlative burden that it is compelled to assume.   See *Ohio Oil Co. v. Indiana*, 177 U. S. 190.   At least, if we have a case within the reasonable exercise of the police power as above explained, no more need be said."

Illustrations of the nature and all-pervading extent of the police power are shown somewhat in the cases already cited.

Other illustrations abound almost without number in the decisions of the state and Federal courts. It will be sufficient for our purposes, however, to call attention to a few of those which most clearly, as we believe, illustrate the doctrine. In *Lawton v. Steele*, 152 U. S. 133, the court used this language:

"The extent and limits of what is known as the police power have been a fruitful subject of discussion in the appellate courts of nearly every state in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power it has been held that the state may order the destruction of a house falling to decay or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane or those afflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the suppression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the state may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests."

Again, in *Holden v. Hardy*, 169 U. S. 366, it was said:

"An examination of both these classes of cases under the fourteenth amendment will demonstrate that, in passing upon the validity of state legislation under that amendment, this court has not failed to recognize the fact that the law is, to a certain extent, a progressive science; that in some of the states methods of procedure, which at the time the constitution was adopted were deemed essential to the protection and safety of the people, or to the liberty of the citizen, have been

found to be no longer necessary; that restrictions which had formerly been laid upon the conduct of individuals, or of classes of individuals, had proved detrimental to their interests; while, upon the other hand, certain other classes of persons, particularly those engaged in dangerous or unhealthful employments, have been found to be in need of additional protection. Even before the adoption of the constitution, much had been done toward mitigating the severity of the common law, particularly in the administration of its criminal branch. The number of capital crimes, in this country at least, had been largely decreased. Trial by ordeal and by battle had never existed here, and had fallen into disuse in England. The earlier practice of the common law which denied the benefit of witnesses to a person accused of felony had been abolished by statute, though so far as it deprived him of the assistance of counsel and compulsory process for the attendance of his witnesses, it had not been changed in England. But to the credit of her American colonies, let it be said that so oppressive a doctrine had never obtained a foothold there.

"The present century has originated legal reforms of no less importance. The whole fabric of special pleading, once thought to be necessary to the elimination of the real issue between the parties, has crumbled to pieces. The ancient tenures of real estate have been largely swept away, and land is now transferred almost as easily and cheaply as personal property. Married women have been emancipated from the control of their husbands and placed upon a practical equality with them with respect to the acquisition, possession and transmission of property. Imprisonment for debt has been abolished. Exemptions from execution have been largely added to, and in most of the states homesteads are rendered incapable of seizure and sale upon forced process. Witnesses are no longer incompetent by reason of interest, even though they be parties to the litigation. Indictments have been simplified, and an indictment for the most serious of crimes is now the simplest of all. In several of the states, grand juries, formerly the only safeguard against a malicious prosecution, have been largely abolished, and in others the rule of unanimity, so far as applied to civil cases, has given way to verdicts rendered by a three-fourth majority. This case does not call for an expression of opinion as to wisdom of these

changes, or their validity under the fourteenth amendment, although the substitution of prosecution by information in lieu of indictment was recognized as valid in *Hurtado v. California*, 110 U. S. 516. They are mentioned only for the purpose of calling attention to the probability that other changes of no less importance may be made in the future, and that while the cardinal principles of justice are immutable, the methods by which justice is administered are subject to constant fluctuation, and that the constitution of the United States, which is necessarily and to a large extent inflexible and exceedingly difficult of amendment, should not be so construed as to deprive the states of the power to so amend their laws as to make them conform to the wishes of the citizens as they may deem best for the public welfare without bringing them into conflict with the supreme law of the land."

So, in *Noble State Bank v. Haskell, supra*, Mr. Justice Holmes said:

"It may be said in a general way that the police power extends to all the great public needs. *Canfield v. United States*, 167 U. S. 518. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare. Among matters of that sort probably few would doubt that both usage and preponderant opinion give their sanction to enforcing the primary conditions of successful commerce. One of those conditions at the present time is the possibility of payment by checks drawn against bank deposits, to such an extent do checks replace currency in daily business. If then the legislature of the state thinks that the public welfare requires the measure under consideration, analogy and principle are in favor of the power to enact it. Even the primary object of the required assessment is not a private benefit as it was in the cases above cited of a ditch for irrigation or a railway to a mine, but it is to make the currency of checks secure, and by the same stroke to make safe the almost compulsory resort of depositors to banks as the only available means for keeping money on hand. The priority of claim given to depositors is incidental to the same object and is justified in the same way. The power to restrict liberty by fixing a minimum of capital required of those who would engage in banking is not denied.

The power to restrict investments to securities regarded as relatively safe seems equally plain. It has been held, we do not doubt rightly, that inspections may be required and the cost thrown on the bank. See *Charlotte, Columbia & Augusta R. R. Co. v. Gibbes*, 142 U. S. 386. The power to compel, beforehand, cooperation, and thus, it is believed, to make a failure unlikely and a general panic almost impossible, must be recognized, if government is to do its proper work, unless we can say that the means have no reasonable relation to the end. *Gundling v. Chicago*, 177 U. S. 183, 188. So far is that from being the case that the device is a familiar one. It was adopted by some states the better part of a century ago, and seems never to have been questioned until now. *Receiver of Danby Bank v. State Treasurer*, 39 Vt. 92; *People v. Walker*, 17 N. Y. 502. Recent cases going not less far are *Lemieux v. Young*, 211 U. S. 489, 496; *Kidd, Dater and Price Co. v. Musselman Grocer Co.*, 217 U. S. 461.

"It is asked whether the state could require all corporations or all grocers to help to guarantee each other's solvency, and where we are going to draw the line. But the last is a futile question, and we will answer the others when they arise. With regard to the police power, as elsewhere in the law, lines are pricked out by the gradual approach and contact of decisions on the opposing sides. *Hudson County Water Co. v. McCarter*, 209 U. S. 349, 355. It will serve as a datum on this side, that in our opinion the statute before us is well within the state's constitutional power, while the use of the public credit on a large scale to help individuals in business has been held to be beyond the line. *Loan Association v. Topeka*, 20 Wall. 655; *Lowell v. Boston*, 111 Mass. 454."

It is argued, however, that the statutes above referred to can be supported on principles not applicable to the statute before us. First, it is said that the statutes creating absolute liability on railroad companies for losses caused by fires from their locomotive engines are in themselves but a return to the common law as it originally existed. But this does not meet the objection. At the time the common law became a rule of action for the American states, the doctrine that negligence or fault of some kind was a necessary element of

liability was as firmly embedded in it as was any other of its
tenets, and to create liability regardless of negligence is now
as fundamental a change in the common law as it would be
had the rule always remained as it now is.    Again, it is
said that the right to use the agencies of fire and steam in
the movement of trains is derived from legislation by the
state, and the state can, for that reason, prescribe such lim-
itations upon, and annex such conditions to, its use as it may
deem fit and necessary to protect from injury those who come
in contact with it.    But the premise here assumed is not
strictly accurate.    The use of fire and steam to propel trains
is not in itself unlawful.    On the contrary, it is as much a
natural right as is the right to propel them by any other
means or to engage in any other lawful enterprise.    Hence,
the power to regulate and interfere with the right must come
from some source other than the inherent unlawfulness of the
act itself.    It is not meant to be said, of course, that the
state, when it grants a charter to a railroad company em-
powering it to construct and operate a railroad within its
boundaries, may not annex to the charter such conditions as
it pleases.    But that is not the question here.    The question
is, whence comes the power to impose these additional bur-
dens upon a railroad corporation by legislative fiat after
it has received its charter and has constructed and is oper-
ating its road thereunder.    Unless the constitution or the
act granting the charter itself expressly reserves such right,
the legislature cannot materially change the charters of rail-
road companies after it has once granted them.    The power
to annex additional conditions thereto must therefore be
found in some other power than the one here alluded to.
Then, again, it is said with reference to these and the bank
guaranty statutes, that the corporations named therein are
affected with a public interest, and that this fact renders
them subject to regulations that they would not otherwise be
subject to.    But again, we say that the legislature, because
of this public interest, may be warranted in imposing such a

condition as a precedent right to engage in the business of
railroading or banking, but it furnishes no reason for im-
posing additional conditions after the business has been en-
tered upon with the consent of the state.   The property of
such institutions is private property, and its ownership is as
secure and free from arbitrary exactions as is the property
invested in enterprises of a more private nature.   Of the
statutes making the landlord liable for damages caused by
the sale of intoxicating liquors by his tenant, it is said that
the traffic is unlawful in itself; that "whiskey is an outlaw,"
and hence the legislature, if it permits its sale at all, may pre-
scribe the terms upon which sales shall be made.   But here
again the assumption is not in accord with the fact.   The
sale of liquor was not unlawful at common law.   On the con-
trary it has been said by as high an authority as the supreme
court of the United States that the state could no more ex-
clude "its importation and sale in original packages without
the consent of Congress than it could exclude the sugar of
Louisiana, the cotton of South Carolina, the wines of Cali-
fornia, the hops of Washington, the tobacco of Maryland
and Connecticut, or the products natural or manufactured of
any state." *Lyng v. Michigan*, 135 U. S. 161.   It refused
to classify intoxicating liquors with rags or other goods in-
fected with disease, or with cattle or meat or other provis-
ions which from their condition are unfit for human use or
consumption; as it was conceded that the state could pro-
hibit the importation and use of these in any form, with or
without the consent of Congress.   It seems to us, therefore,
that it cannot be successfully controverted that all of these
statutes rest upon the same basic principle on which the
statute at bar rests; that is to say, they have their founda-
tion in the police power of the state.

Nor is it sufficient to exclude the industries mentioned in
the act before us from the operation of these principles to
say that they are lawful callings, not subject to absolute pro-
hibition.   As we have said in another place, lawful trades

and businesses, although private in their nature, are subject to the police power, and may be controlled and regulated under it whenever the welfare of the state requires it.  This is well illustrated by the laws of our own state.  For example, the statute requiring employers of labor to pay their employees in lawful money; the statute requiring employers of female help in stores or offices to provide each of them with a chair or stool on which to rest when their duties permit; the statute prohibiting the employment of females in any mechanical or mercantile establishment, laundry, hotel or restaurant, for more than ten hours in any one day; the statute limiting the number of hours an employee will be permitted in any one day to work underground in a coal mine; the statute requiring machinery in factories, mills and workshops, the openings of all hoistways, hatchways, elevators and well holes, to be guarded; the statute appointing a commissioner of labor, and empowering him to inspect mills and factories and charge the cost thereof to the mill or factory inspected, are all statutes regulating lawful trades or businesses not affected with public interests; yet each and all of them have been upheld and enforced in a long line of cases by this court.  *State v. Buchanan*, 29 Wash. 602, 70 Pac. 52, 92 Am. St. 930, 59 L. R. A. 342; *Kirkham v. Wheeler-Osgood Co.*, 39 Wash. 415, 81 Pac. 869; *Shortall v. Puget Sound Bridge & Dredging Co.*, 45 Wash. 290, 88 Pac. 212; *Hall v. West & Slade Mill Co.*, 39 Wash. 447, 81 Pac. 915; *Whelan v. Washington Lumber Co.*, 41 Wash. 153, 83 Pac. 98, 111 Am. St. 1006.

The supreme court of the United States in *Sentell v. New Orleans etc. R. Co.*, 166 U. S. 698, speaking of the power of the state to interfere with private property, used this language:

"That a state, in a *bona fide* exercise of its police power, may interfere with private property, and even order its destruction, is as well settled as any legislative power can be, which has for its objects the welfare and comfort of the cit-

izen.   For instance, meats, fruits and vegetables do not cease to become private property by their decay; but it is clearly within the power of the state to order their destruction in times of epidemic, or whenever they are so exposed as to be deleterious to the public health.   There is also property in rags and clothing; but that does not stand in the way of their destruction in case they become infected and dangerous to the public health.   No property is more sacred than one's home, and yet a house may be pulled down or blown up by the public authorities, if necessary to avert or stay a general conflagration, and that, too, without recourse against such authorities for the trespass."

The power to regulate, therefore, applies alike to all employments.   The test of the power is found in the effect the pursuit of the calling has upon the public weal, rather than in the inherent nature of the calling itself.

In *Allgeyer v. Louisiana*, 165 U. S. 578, the court, referring to the fourteenth amendment to the constitution of the United States, said:

"The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned."

It is thought the act at bar interferes with certain of the personal rights here defined, particularly with the right of contract, and is for that reason violative of this provision of the constitution.   But it is recognized in the case cited, and in many others, that these rights are not absolute.   On the contrary, it has been many times said that there is no absolute right to do as one wills, pursue any calling one desires, or contract as one chooses; that the term liberty means

absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. The principle was thus stated in *Frisbie v. United States*, 157 U. S. 160:

"A second objection, insisted upon now as it was by demurrer to the indictment, is that the act under which the indictment was found is unconstitutional, because interfering with the price of labor and the freedom of contract. This objection also is untenable. While it may be conceded that, generally speaking, among the inalienable rights of the citizen is that of the liberty of contract, yet such liberty is not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power to make any contract releasing himself from negligence, and, indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property."

Again, in the case of *Holden v. Hardy*, 169 U. S. 366, the court, holding constitutional the statute of the state of Utah fixing the number of hours a workingman should be permitted to work continuously in underground mines, used this language:

"This right of contract, however, is itself subject to certain limitations which the state may lawfully impose in the exercise of its police powers. While this power is inherent in all governments, it has doubtless been greatly expanded in its application during the past century, owing to an enormous increase in the number of occupations which are dangerous, or so far detrimental to the health of employees as to demand special precautions for their well-being and protection, or the safety of adjacent property. While this

court has held, notably in the cases *Davidson v. New Orleans,*
96 U. S. 97, and *Yick Wo v. Hopkins,* 118 U. S. 356, that the
police power cannot be put forward as an excuse for op-
pressive and unjust legislation, it may be lawfully resorted
to for the purpose of preserving the public health, safety or
morals, or the abatement of public nuisances, and a large
discretion 'is necessarily vested in the legislature to deter-
mine not only what the interests of the public require, but
what measures are necessary for the protection of such in-
terests.' "

So, in *State v. Buchanan, supra,* this court, holding con-
stitutional the act limiting the number of hours women could
be required to work in one day in mechanical and mercantile
establishments, said:

"Law is, or ought to be, a progressive science. While the
principles of justice are immutable, changing conditions of
society and the evolution of employment make a change in
the application of principles absolutely necessary to an in-
telligent administration of government. In the early his-
tory of the law, when employments were few and simple, the
relative conditions of the citizen and the state were different,
and many employments and uses which were then consid-
ered inalienable rights have since, from the very necessity of
changed conditions, been subjected to legislative control,
restriction, and restraint. This all flows from the old an-
nouncement made by Blackstone that when man enters into
society, as a compensation for the protection which society
gives to him, he must yield up some of his natural rights,
and, as the responsibilities of the government increase, and
a greater degree of protection is afforded to the citizen, the
recompense is the yielding of more individual rights. Trans-
portation companies are now controlled and restricted, where
a few years ago they claimed the right to transact their
business exactly as it suited their private interests. The
practice of medicine is restricted and controlled; laws against
quackery and empiricism are enforced without question. The
sale of liquor, which formerly was a legitimate business, and
which the citizen had a right to enter into, as he did any
other business, without any restrictions, has now become
subject to the control of the state, or to actual prohibition
at the will of the state. The changing conditions of society

have made an imperative call upon the state for the exercise of these additional powers, and the welfare of society demands that the state should assume these powers, and it is the duty of the court to sustain them whenever it is found that they are based upon the idea of the promotion and protection of society."

If, therefore, the act in controversy has a reasonable relation to the protection of the public health, morals, safety or welfare, it is not to be set aside because it may incidentally deprive some person of his property without fault or take the property of one person to pay the obligations of another.    To be fatally defective in these respects, the regulation must be so utterly unreasonable and so extravagant in nature and purpose as to capriciously interfere with and destroy private rights.

That the statute here in question has the attribute of reasonableness, rather than that of capriciousness, seems incontrovertible.    The evil it seeks to remedy is one that calls loudly for action.    Accidents to workmen engaged in the industries enumerated in it are all but inevitable.    It seems that no matter how carefully laws for the prevention of accident in such industries may be framed, or how rigidly they may be enforced, there is an element of human equation that enters into the problem which cannot be eliminated and which invariably causes personal injuries and consequent financial losses to workmen engaged therein.    Heretofore these losses have been borne by the injured workmen themselves, by their dependents, or by the state at large.    It was the belief of the legislature that they should be borne by the industries causing them, or, perhaps more accurately, by the consumers of the products of such industries.    That the principle thus sought to be put into effect is economically, sociologically, and morally sound, we think must be conceded. It is so treated by the learned counsel who have filed briefs in support of the auditor's contentions; it is so conceded by all modern statesmen, jurists, and economic writers who

have voiced their opinions on the subject; and the principle
has been enacted into law by nearly all of the civilized coun-
tries of Europe, by Australia, by New Zealand, by the Trans-
vaal, by the principal provinces of the Dominion of Canada,
and in a partial form at least by one or more of South Amer-
ican Republics.    Indeed, so universal is the conception that
to assert to the contrary is to turn the face against the en-
lightened opinion of mankind.    The common law does not
purport to afford a remedy for the condition here found to
exist.    It affords relief to an injured workman in only a
limited number of cases; cases where the injury is the result
of fault on the part of the employer and there is want of
fault on the part of the workman.    For the greater number
of injuries traceable to the dangers incident to industry,
no remedy at all is afforded.    The act, therefore, having in
its support these economic and moral considerations, is not
unconstitutional for the reasons suggested upon this branch
of the argument.

Passing to the second objection, it is well settled that
neither the clause of the state constitution prohibiting class
legislation, nor the clause of the fourteenth amendment to
the constitution of the United States relating to the equal
protection of the laws, takes from the state the power to
classify in the adoption of police regulations.    The limita-
tions imposed admit of a wide discretion in this respect, and
avoid only what is done without any reasonable basis; that is,
such regulations as are in their nature arbitrary.    The
learned counsel for the auditor recognize this distinction,
and consequently do not attack the act because it is confined
to extra hazardous occupations as its field of regulation, but
complain because its benefits are not confined to workmen
injured while engaged in such occupations.    It is claimed
that the act allows workmen employed in such industries the
benefit of the act when injured outside of the line of their
duties, or when engaged in the business of the concern in a
capacity not affected by the peculiar hazards of the business.

We have quoted enough of the statute to show that it is somewhat obscure in these respects, but we are not inclined to think the point fatal to the act, even though we concede counsel's interpretation of it to be the correct one.  In section 27, the legislature has made it clear that it did not intend the provisions relating to those who are entitled to partake of its benefits to be so far an integral part of the act that it could not be eliminated in part without destroying the act in its entirety.  It is there expressly provided that the adjudication of invalidity of any part of the act shall not affect the validity of the act as a whole or any other part thereof.  This means that the legislature intended the act to be enforced as far as it may be, even though it might not be valid in its entirety.  It was competent for the legislature so to provide.  Anything it could have eliminated itself and left an operative act, can be eliminated by the courts without destroying the entire act, if it is the will of the legislature that the remaining parts of the act shall stand after such elimination.  So here, if it be true that the legislature has gone too far in this direction, and has attempted to include within its benefits certain employees who cannot be included without including employees generally, these can be omitted in the administration of the act without the necessity of nullifying the entire act.  But whether any such workmen are so improperly included, we shall not here determine.  The question can best be met when it arises during the course of the act's administration.

Again, it is said that the act violates the provisions relating to class legislation because it diverts the contributions exacted from the numerous industries to the relief of a particular class of injured and disabled workmen, instead of applying it to the relief of injured workmen generally or applying it to the use of the state at large.  But to divert the money collected in this manner to a special use is one of the prerogatives of legislation.  The right of the state to regulate any form of industry arises from the fact that its pur-

suit affects injuriously the health, safety, morals, or welfare of the persons engaged in it, or is inimical in some form to some portion of the individuals of the community. It is not necessary that it always affect injuriously the public at large. On the contrary, it may be regulated if it affects injuriously those engaged in it, or those brought in direct contact with it, even though its pursuit may benefit generally the people of the state at large. Nor is there any particular form which the regulation must take. The conduct of the business may be prohibited entirely in a particular place or in a particular manner; its pursuit may be restricted to certain hours of the day; it may be permitted to be conducted only in case protective devices are used; or it may be permitted in certain forms and a sum of money exacted from the individuals carrying it on for the purpose of recompensing those who suffer losses because thereof.

So in this instance, if the legislature believed that to permit the pursuit of the industries named after the present manner of conducting them was generally for the public good in spite of the losses the method of pursuit entailed, there is no reason why it should not confine its regulations to compelling the owners and conductors of such industries to create a fund out of which the losses caused thereby should be made good. That legislation in this form is not class legislation, nor a denial to owners of property of the equal protection of the laws, is well sustained by authority.

In *Jensen v. South Dakota Cent. R. Co., supra*, the court, discussing the question, used this language:

"The exercise of the police power in this class of cases is based upon the ground that, where persons are engaged in a calling or business attended with danger to other persons and their property, then the legislature may step in and impose conditions upon the exercise of such calling or business for the general good and welfare of society, and may prescribe the terms on which such dangerous calling or business will be permitted to be carried on by persons in charge thereof, whether such persons happen to be private individuals or rail-

way corporations.   The fact that such legislative exercise
of the police power applies alike to all persons and all cor-
porations engaging in such dangerous calling or business
relieves it from the charge and contention that there is a
denial of equal protection under the law by reason of such
enactments."

In *Firemen's Benevolent Ass'n v. Lounsbury, supra,* the
court had under consideration a statute of the state of Illi-
nois which created a corporation called the Firemen's Benev-
olent Association, and required every insurance agent in the
city of Chicago to pay to the association a fixed percentage
upon the amount of fire insurance premiums collected by him
per year from fire insurance effected upon property in the
city, to be used solely for the relief of distressed, sick, injured,
or disabled firemen and their immediate families.   Answering
the objection that the act was void as class legislation, the
court said:

"There is nothing to be found in the constitution which
can be held to inhibit the legislature from imposing burthens,
or raising money from citizens of the state, which is not for
the direct benefit of the state, and is never designed to belong
to the state.   To deprive the legislature of this power, would
to a great extent destroy its usefulness—while it would to a
certain extent, deprive it of the power of abuse, it would de-
stroy its power to regulate by law a thousand things, which
the public good requires should be regulated by law. . . .
Let us once hold that the legislature could not compel any
citizen to submit to a burthen, except for the benefit of the
state aggregate, or for some subdivision of it, as a county,
city or town, or to pay any money except it shall go into
the state or some subordinate public treasury, and we should
soon find ourselves on the brink of anarchy itself—we should
tie up the hands of the legislature it is true, so that they
might not do some evils which they have hitherto had the
power of doing; but we should also let loose upon society ten
thousand evils, which in every well regulated community it
has always been the duty of the legislature to suppress.   It
is in the exercise of this indispensable power, that ferries, toll
bridges and the like are licensed or chartered.   The legisla-
ture, finding it necessary to afford especial encouragement to

private enterprise to erect a bridge or a ferry, has ever exercised the power of imposing a burthen on some, for the benefit of others.   Who ever doubted the right of the legislature to charter a bridge and to require all persons crossing the stream within certain limits, to pay the tolls, whether they cross on the bridge or not?   It is the exercise of the same power, which fixes the fees of officers for the performance of certain services.   It· is the power which the legislature possesses, of imposing burthens upon certain members of the community who are supposed to be benefited, by the efforts or acts of certain other members of the community, as a reward or compensation for such acts. . . . It would fill a volume to enumerate all the familiar instances of the exercise of this power—a power which must be exercised constantly in every civilized community, or the well being of that community must vitally suffer."

In *State v. Cassidy*, 22 Minn. 312, 21 Am. Rep. 765, the court sustained an act which required the vendors of intoxicating liquors to pay a fixed sum per annum into the state treasury, in addition to the usual license fee, as a fund to be disbursed by a state commission in the creation and operation of a state asylum for the care and cure of inebriates.   The court in its opinion points out that the act is an exercise of police power, saying:

"It regards the traffic as one tending to produce intemperance, and as likely, by reason thereof, to entail upon the state the expense and burthen of providing for a class of persons rendered incapable of self-support, the evil influence of whose presence and example upon society is necessarily injurious to the public welfare and prosperity, and, therefore, calls for such legislative interposition as will operate as a restraint upon the business, and protect the community from the mischiefs, evils and pecuniary burthens flowing from its prosecution. . ·. . That these provisions unmistakably partake of the nature of police regulations, and are strictly of that character, there can be no doubt, nor can it be denied that their expediency or necessity is solely a legislative, and not a judicial, question. . . .

"Regarding the law as a precautionary measure, intended to operate as a wholesome restraint upon the traffic, and as

a protection to society against its consequent evils, the exacted fee is not unreasonable in amount, and the purpose to which it is devoted is strictly pertinent and appropriate. It could not be questioned but that a reasonable sum imposed in the way of an indemnity to the state against the expense of maintaining a police force to supervise the conduct of those engaged in the business, and to guard against the disorders and infractions of law occasioned by its prosecution, would be a legitimate exercise of the police power, and not open to the objection that it was a tax for the purpose of revenue, and, therefore, unconstitutional. Reclaiming the inebriate, restoring him to society, prepared again to discharge the duties of citizenship, equally promotes the public welfare, and tends to the accomplishment of like beneficial results, and it is difficult to see wherein the imposition of a reasonable license fee would be any the less a proper exercise of this power in the one case than in the other. The purpose to which the license fund created by the act is designated is more consonant to the idea of regulating the traffic and preventing its evils than is the case under the general license law, which devotes the fees received to common school purposes, and we are not aware that any objection has ever been urged against that law on that account."

A statute of Kentucky imposed upon all dogs a tax at a fixed sum per capita, to be paid by their owners, for the creation of a fund to be disbursed to sheep growers whose sheep should be injured or destroyed by the ravages of dogs. In *McGlone v. Womack*, 129 Ky. 274, 111 S. W. 688, 17 L. R. A. (N. S.) 855, this statute was challenged by a number of owners of dogs on the ground that it violated the state constitution. Answering the objection that it was class legislation, the court said:

"Nor do we think the act is inimical to that portion of section 3 of the bill of rights which provides: '. . . And no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men, except in consideration of public services. . . .' As we view it, the statute does not confer any special privilege on the owner of sheep. It merely protects these owners from the destruction of their property by dogs. It is the duty of the state to

protect every citizen in his life, liberty, and property; and it certainly is within the competency of the legislature to exercise the police power of the state to protect all property against the ravages of destructive animals.   The question as to how this is to be done and what property is to be so protected is a matter of legislative discretion.   Undoubtedly the sheep industry is a most important one to the whole state. All of our citizens are interested in an industry which supplies the market with wholesome meat, provides means of obtaining warm and comfortable clothing, and at the same time furnishes labor to the otherwise unemployed.   It is only necessary to allude to this phase of the question.   The importance of the industry as a whole is most obvious.   It is equally obvious that sheep are peculiarly liable to the ravages of dogs.   They have neither the fleetness to escape nor the courage to defend themselves from attack, and their silent suffering enables the dog to prey upon them without any danger that the owner will be warned of the destruction of his property by the outcry of the dying animal.  . . .  The fact that sheep are generally killed at night when it is impossible to ascertain the owner of the dog committing the ravage makes it necessary, if protection is to be had through this channel at all, that each owner of a dog should be required to contribute a small amount to a common fund dedicated to the remuneration of owners of sheep killed by unknown dogs.   As said before, this is simply requiring the owners of dogs to make good the ravages of dangerous animals kept by them; and no citizen has just cause of complaint, if he keeps animals destructive to the property of others, that he is required to make good the damages done by them.   The statute in truth, is but an enforcement of the maxim, 'sic utere tuo ut allenum non laedas,' and, as such, its constitutionality is beyond successful question."

See, also, *Leavitt v. City of Morris,* 105 Minn. 170, 117 N. W. 393, 17 L. R. A. (N. S.) 984; *Mitchell v. Williams,* 27 Ind. 62; *Van Horn v. People,* 46 Mich. 183, 9 N. W. 246, 41 Am. Rep. 159; *Cole v. Hall,* 103 Ill. 30; *Longyear v. Buck,* 83 Mich. 236, 47 N. W. 234, 10 L. R. A. 43; *Holst v. Roe,* 39 Ohio St. 340, 48 Am. Rep. 459; *State v. Frame,* 39 Ohio St. 399.

The foregoing cases, while defending the statute here in

question against the charge of class legislation, are interesting from another aspect also. They furnish examples of constitutional statutes creating liability without fault. To effect insurance as an agent, to sell intoxicating liquors where not forbidden by the state, or to own and keep dogs, is not of itself unlawful; and it would seem that any reason which would justify the levying of a tax on persons pursuing these occupations as business callings, or owning and keeping the species of property mentioned, would justify the levy sought to be made by the act before us.

The third principal objection to the constitutionality of the act is that it violates the provisions of the constitution designed to secure equal and uniform taxation of property for public purposes. As the charge laid on the persons engaged in the industries named in the act is a pecuniary burden imposed by public authority, it partakes of the nature of a tax, and in the language of a distinguished judge discussing a similar question, "for many purposes might be so spoken of without harm." But it is manifest that it is not a tax in the sense the word is used in the sections of the constitution to which reference is here made. No accession to the public revenue, general or local, is authorized or aimed at. The purpose of the exaction is entirely different. It is to be used, not to meet the current expenses of government, but to recompense employees of the industries on whom the burden is imposed for injuries received by them while engaged in the pursuit of their employments. It is the consideration which the owners of the industries pay for the privilege of carrying them on. It is, therefore, in the nature of a license tax, and can be justified on the principle of law that justifies the imposition and collection of license taxes generally. In this state, such taxes may be imposed, either as a regulation or for the purposes of revenue, the only limitation upon the power being that such taxes when imposed on useful trades and industries shall not be unreasonable, and if a class of trades or industries is selected from the whole, and the tax

imposed upon the class selected . alone rather than upon the whole, that there be some reasonable ground for making the distinction. *Walla Walla v. Ferdon*, 21 Wash. 308, 57 Pac. 796; *Fleetwood v. Read*, 21 Wash. 547, 58 Pac. 665, 47 L. R. A. 205; *Stull v. DeMattos*, 23 Wash. 71, 62 Pac. 451, 51 L. R. A. 892; *Seattle v. Barto*, 31 Wash. 141, 71 Pac. 735; *In re Garfinkle*, 37 Wash. 650, 80 Pac. 188; *Oilure Mfg. Co. v. Pidduck-Ross Co.*, 38 Wash. 137, 80 Pac. 276; *McKnight v. Hodge*, 55 Wash. 289, 104 Pac. 504.

The general rule governing the right to impose such license taxes is well stated by Judge Brewer in *City of Newton v. Atchison*, 31 Kan. 151, 1 Pac. 288, 47 Am. Rep. 486, in the following language:

"Before noticing some specific objections which are made to this particular tax, we think it proper to state certain general propositions which underlie this matter of a license tax.

"First. In the absence of any inhibition, express or implied, in the constitution, the legislature has power, either directly to levy and collect license taxes on any business or occupation, or to delegate like authority to a municipal corporation. This seems to be the concurrent voice of all the authorities. In 1 Dillon on Municipal Corporations, 3d ed., sec. 357, note, the author says: 'Unless specially restrained by the constitution, the legislature may provide for the taxing of any occupation or trade, and may confer this power upon municipal corporations.' In Burroughs on Taxation, page 148, is this language: 'Where the constitution is silent on the subject, the right of the state to exact from its citizens a tax regulated by the avocations they pursue, cannot be questioned.' In *Savings Society v. Coite*, 6 Wall. 606, the supreme court of the United States thus states the law: 'Nothing can be more certain in legal decision than that the privileges and franchises of a private corporation, and all trades and avocations by which the citizens acquire a livelihood, may be taxed by a state for the support of the state government.' (*Hamilton Co. v. Massachusetts*, 6 Wall. 638; Cooley on Taxation, 384 to 392, 410.) On page 384 the author observes, 'The same is true of occupations; government may tax one, or it may tax all. There is

no restriction upon its power in this regard unless one is expressly imposed by the constitution.'

"In *State Tax on Foreign-held Bonds*, 15 Wall. 300, Field, J., among other things, speaking of the power of taxation, says:

" 'It may touch property in every shape, in its natural condition, in its manufactured form and in its various transmutations. And the amount of taxation may be determined by the value of the property, or its use, or its capacity, or its productiveness. It may touch business in the almost infinite forms in which it is conducted; in professions, in commerce, in manufactures, and in transportation. Unless restrained by the constitution, the power as to the mode, forms and extent of taxation is unlimited.'

"(See also the authorities collected in *Fretwell v. City of Troy*, 18 Kas. 274.)   Nor does this rest alone upon a mere matter of authority.   Full legislative power is, save as specially restricted by the constitution, vested in the legislature.   Taxation is a legislative power.   Full discretion and control therefore in reference to it are vested in the legislature, save when specially restricted.   There is no inherent vice in the taxation of avocations.   On the contrary, business is as legitimate an object of the taxing power as property.   Oftentimes a tax on the former results in a more even and exact justice than one on the latter.   Indeed, the taxing power is not limited to either property or avocations.   It may, as was in fact done during the late war and the years immediately succeeding, be cast upon incomes, or placed upon deeds and other instruments.   We know there is quite a prejudice against occupation taxes.   It is thought to be really double taxation.   Judge Dillon well says that 'such taxes are apt to be inequitable, and the principle not free from danger of great abuse.'   Yet, wisely imposed, they will go far toward equalizing public burdens.   A lawyer and a merchant may, out of their respective avocations, obtain the same income.   Each receives the same protection and enjoys the same benefits of society and government.   Yet the one having tangible property pays taxes; the other, whose property is all in legal learning and skill, wholly intangible, pays nothing.   A wisely-adjusted occupation tax equalizes these inequalities.   But after all, these are questions of policy, and for legislative consideration.   It is enough for the courts

that both occupation and property are legitimate objects of taxation; that they are essentially dissimilar; that constitutional provisions regulating the taxation of one do not control that of the other; and that there are no constitutional inhibitions on the taxation of business, either by the legislature directly, or by the municipal corporations thereto empowered by the legislature.

"Second. There is no inhibition, express or implied, in our constitution, on the power of the legislature to levy and collect license taxes, or to delegate like power to municipal corporations. It is not pretended that there is any express inhibition. It has been contended that sec. 1, art. 11 creates an implied inhibition, and this because it reads that 'the legislature shall provide for a uniform and equal rate of assessment and taxation.' But that section obviously refers to property, and not to license taxes."

In *Fleetwood v. Read, supra,* this court, discussing the question whether taxation of this sort was prohibited by the constitution, said:

"It is insisted, also that the ordinance is void because it imposes a burden upon a portion, and not the whole, of a class of merchants. We do not think this contention is tenable. The ordinance does apply to all merchants who see fit to engage in the business of buying tickets of that kind, and the constitutional provision (art. 1, sec. 12) that no law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations, cannot be invoked against this ordinance. The adjudicated cases in this respect are so numerous that it is scarcely worth while to mention them here.

"The ordinance cannot be held void on account of excessive burden imposed. It is not so oppressive that it will in any way interfere with the rights of merchants. However wrong the policy may be which prompted the enactment of this ordinance, or however doubtful the propriety of passing such an ordinance, those are questions which are submitted by the legislature to the discretion of the council, and upon them it is not our province to comment. We think, without further

investigation, that there is no doubt. that the ordinance is warranted by legislative authority.

"Some question was raised by the court at the time of the argument of this case in relation to the ordinance being in conflict with secs. 1, 2 and 9 of art. 7 of the state constitution, which provide for uniformity in taxation.  Counsel for the respondent was requested by the court to furnish it with a brief on that subject, which he did, and upon an examination of the cases cited and of other cases, we have become convinced that the question raised by the court was not a question pertinent in this case; that, under the great weight of authority, a tax on occupation, business, etc., is not, in legal contemplation, a tax on property, which falls within the inhibition imposed by the usual constitutional provisions in relation to uniformity of taxation; and, in consideration of the fact that the state constitution is a limitation upon the actions and powers of the legislature instead of a grant of power, that the power of the legislature to tax trades, professions and occupations is, in the absence of constitutional restriction, a matter within its absolute control and resting entirely in sound legislative discretion."

The sums exacted from the several industries named we think may be treated as partaking both of the nature of a license for revenue and regulation; as such, however, we find nothing in the principle inimical to either the state or Federal constitutions.

The fourth principal reason for which the act is thought to be unconstitutional is that it interferes with the right of trial by jury.  It is said that the legislature cannot fix a Procrustean rule for the admeasurement of damages arising from injuries received by one in the employment of another, as the employer and the employee alike have the right to submit to a jury both the question of the right to recover for any.such injury, and the question of the amount that may be recovered therefor.  But we cannot think the rule absolute.  It may be that the legislature cannot fix the amount of recovery, or provide for an absolute recovery, in all cases where one person is injured by another, regardless of the relation of the parties, or the question whether the injury is

or is not the result of negligence; but it does not follow that it may not so provide where the injury happens in that class of employments subject to legislative regulation and control. If it be, as we have attempted to show, a proper regulation of hazardous industries to compel those engaged therein as owners or operators to pay a fixed sum into a fund to be used for the purpose of compensating the employees thereof for injuries received by them, it is difficult to understand why it is not also proper regulation to require the employees of such industries to accept a given sum for any injury that they may receive while so engaged. The same power that authorizes the state to regulate the participation of the one in the particular industry would seem to authorize it to regulate the participation of the other therein. Theoretically, of course, the employer and employee, on entering into a contract by which the one engages the services of the other, stand on the same plane; but in practice, as it is well known, this ideal condition very seldom exists. Greed and sagacity on the one side, and necessity and incapacity on the other, sometime lead to contracts that create conditions little short of peonage; and our own reports abound with instances where men have been induced to work in situations so dangerous to life and limb that the wonder is not that some of them were injured, but rather, that any of them escaped injury. Indeed, it is a common thing for an employer, in defense of an action of damages brought by his employee for injury received in such a situation, to urge that the dangers of the place were so obvious and apparent that the employee was guilty of contributory negligence for working therein. These conditions, we think, authorize the interference of the legislature. The grounds upon which the employer may be held to contribute to a fund for the relief of all injuries sustained by his employees whatever the cause, we have already stated. The obligation of the employee to accept the conditions of the statute can rest on like grounds: namely, the welfare of the state. The relation being one of contract between em-

ployer and employee, the state may make it a condition of
the contract that the employee shall accept a fixed sum for
any injury he may receive while engaged in the employment,
whether the injury be the result of the inherent dangers of
the employment or the result of some fault of his employer.

There is, of course, no direct authority supporting the con-
tention that the right of trial by jury may be thus taken
away.   There are, however, cases maintaining principles
more or less analogous to the principle thus involved.   Of
these *State v. Buchanan,* and *Holden v. Hardy, supra,* are
illustrative.   In these cases it is held that the legislature may
limit the number of hours a workman shall be permitted to
labor in certain classes of employments, on the principle that
to do so is to protect the health of the individual workman
and thus contribute to the public welfare.   If it be within the
rule of the police powers of the state to interfere with the
workman's personal freedom in this regard, it would seem to
be no greater stretch of power to go one step farther and
provide that if he be injured while so laboring, he shall re-
ceive a sure award in a limited sum as compensation for his
injury, and in lieu thereof shall forego his common law action
in damages therefor.

The common law system of making awards for personal
injuries has no such inherent merit as to make a change un-
desirable.   While courts have often said that the question of
the amount of compensation to be awarded for a personal
injury is one peculiarly within the province of the jury to
determine, the remark has been induced rather because no
better method for solving the problem is afforded by that sys-
tem than because of the belief that no better method could be
devised.   No one knows better than judges of courts of *nisi
prius* and of review that the common law method of making
such awards, even in those instances to which it is applicable,
proves in practice most unsatisfactory.   All judges have
been witnesses to extravagant awards made for most trivial
injuries, and trivial awards made for injuries ruinous in the

nature; and perhaps no verdicts of juries are interfered with so often by the courts as verdicts making awards in such cases. There is no standard of measurement that the court can submit to the jury by which they can determine the amount of the award. The test of reasonableness means but little to the ordinary juror. Unused as he. is generally to witnessing the results of injuries, he is inclined to measure his verdict by the amount of disorder he observes, rather than by the actual amount of disablement the injury has caused. Nor is he aided in this respect by the testimony of medical experts. Conflicting as such testimony usually is, it tends rather to confuse than to enlighten him. Perhaps the whole difficulty lies in the fact that the question is too much one of opinion, and not enough of fact. It must be remembered, also, that the remedy afforded by the common law, as we have elsewhere remarked, can be applied only in a limited number of cases of injury; cases where the injury is the result of negligence on the part of the employer, not contributed to by the employee. For the greater number of injuries the common law affords no remedy at all. For this unscientific system, it is proposed to substitute a system which will make an award in all cases of injury, regardless of the cause or manner of its infliction; limited in amount, it is true, but commensurate in some degree to the disability suffered. The desirability of this substitution is unquestioned, and we believe that the legislature had the power to make it without violating any principle of the fundamental law.

The objection may be answered also in another way. The constitution does not undertake to define what shall constitute a cause of action, nor to prohibit the legislature from so doing. The right of trial by jury accorded by the constitution, as applicable to civil cases, is incident only to causes of action recognized by law. The act here in question takes away the cause of action, on the one hand, and the ground of defense, on the other; and merges both in a statutory indemnity, fixed and certain. If the power to do away with a

cause of action in any case exists at all, in the exercise of the police power of the state, then the right of trial by jury is thereafter no longer involved in such cases. The right of jury trial being incidental to the right of action, to destroy the one is to leave the other nothing upon which to operate.

The auditor also complains of the scheme adopted by the legislature for correcting the evil they have found to exist. It is said that the scheme is unduly cumbersome; that its administration will prove unnecessarily costly and burdensome to those whose interests are affected by it, and will lead to public and private abuses and consequent evils more dangerous to the state than the evil that it is sought to correct. But the courts are slow to inquire into the mere wisdom of a statute. This question is so preeminently one for the law-making branch of the government that the courts will interfere only where there can be no two opinions as to the mischievous and evil tendencies of the act. The act in question here was framed by a commission composed of men eminent for their ability, who gave to the work extended consideration. It was selected by the legislature from among a number of proposed acts having a similar purpose submitted for their examination; and this, too, after its supposed evil tendencies had been fully pointed out by the representatives of the different interests to be affected by it. In the light of these facts, the court cannot do otherwise than put it to the test of practice. Moreover, the question becomes one of less importance when it is remembered that the sessions of the legislature are sufficiently close together to enable that body to correct any evil effect the enforcement of the act may have before it becomes unduly harmful.

In the foregoing discussion we have not referred to the decision of the court of appeals of the state of New York in the case of *Ives v. South Buffalo R. Co.*, 201 N. Y. 271, 94 N, E. 431, which holds the workingmen's compensation act of that state to be in conflict with the due process of law clause of the state constitution, and the fourteenth amendment to

the constitution of the United States.    The case has, how-
ever, been the subject of extended consideration in the briefs
of counsel, and it is urged upon us by counsel for the auditor
as conclusive of the questions at bar.    The act the court
there had in review is dissimilar in many respects to the act
before us, and is perhaps less easily defended on economic
grounds.    The principle embodied in the statutes is, however,
the same; and it must be conceded that the case is direct au-
thority against the position we have here taken.    We shall
offer no criticism of the opinion.    We will only say that, not-
withstanding the decision comes from the highest court of
the first state of the Union, and is supported by a most per-
suasive argument, we have not been able to yield our consent
to the views there taken.

We conclude, therefore, that the act in question violates
no provision of either the state or Federal constitutions, and
that the auditor should give it effect.    Let the writ issue.

DUNBAR, C. J., CROW, MORRIS, ELLIS, MOUNT, PARKER,
and GOSE, JJ., concur.

CHADWICK, J. (dissenting in part)—This proceeding is
prosecuted by the relator, a simple contract creditor of the
state.    There is no party in interest before us whose interest it
is to challenge the act of the legislature.    This is a moot case,
pure and simple, and the right of the relator to recover is in
no way affected by the constitutional questions raised by the
parties and discussed by the court.    The legislature having
created the industrial insurance commission, its power to or-
ganize cannot be questioned by any one who is not affected
by the terms of the law, and such expenses as it may incur
are proper charges against the state and may be collected
without reference to the power of the commission to levy a
tribute upon certain kinds of business, or to make disburse-
ment of the funds under the provisions of the act.

Without questioning or discussing the conclusions of the
court upon the first three propositions advanced, with all of

which I agree, the fourth proposition should not now be de-
cided for the very palpable reason that our decision is binding
upon no one, not even upon the court. No one will
contend that it is of any concern to a furniture dealer
who is seeking to collect his account whether an injured
workman is to be deprived of the right to submit his cause to
a jury of his peers. The principle is too important to be
mooted by the court, for some day a real party in interest
will be before us—either an employer who feels aggrieved
at the operation of the law, or a workman who has received
injuries which the accepted schedules will not compensate;
and we will be put to the duty of deciding the case without
reference to our present decision, so that the Federal ques-
tions involved may pass for final hearing to the supreme
court of the United States.

The right to recover damages for personal injuries suf-
fered in consequence of the negligence of another was an ad-
mitted right at common law, so that the question whether the
seventh amendment to the constitution of the United States,
which preserves the right of trial by jury in all cases main-
tainable at common law which are begun in the courts of the
United States, would not compel a Federal court to ignore
our statute, and the consequent question, whether a party
assessed could be compelled to contribute to the indemnity
fund unless he is to be protected from all suits of like char-
acter, becomes most material, and it is to be hoped that we will
have an early opportunity to meet these issues in a proper
case.

That the people of the state of Washington can take away
a right of action, or abolish the right of trial by jury, I have
no doubt, but whether the legislature can do so without the
warrant of the whole people expressed by way of amendment
or repeal of sections 3 and 21 of article 1 of the state consti-
tution, is a grave question which is not discussed in the opin-
ion of the court. The right of trial by jury has ever been
regarded as the very sinew of liberty. It was the cardinal

principle of the great charter, and "It is worthy of note that all that is extant of the legislation of the Plymouth Colony for the first five years, consists of the single regulation 'that all criminal facts, and also all manner of trespasses and debts between man and man, shall be tried by the verdict of twelve honest men, to be impaneled by authority, in form of a jury upon their oath.' 1 Palfrey's New England, 340." Cooley's Const. Limitations (6th ed.), p. 389, n.

The right is asserted in every state constitution. Sec. 21, *supra,* provides that "the right of trial by jury shall remain inviolate." No distinction is made between civil and criminal cases; indeed the additional text would indicate that no distinction was intended. This guarantee has been held by this court to apply to all civil law actions maintainable at common law. *State ex rel. Mullen v. Doherty,* 16 Wash. 382, 47 Pac. 958, 58 Am. St. 39. I am a firm believer in trial by jury and am of equal faith that the will of the people as declared in their written constitution is binding upon legislatures as well as courts, until the people by like adoption express a contrary will. We should not decide otherwise except at the suit of a proper party.

The present law seems to be greatly to the advantage of the employer for whom an easy method of discharging an obligation to his injured employee is provided, but whether the legislature can take from the workingman his right to have the amount of his compensation fixed by an authority less than the very people, who have said "the right of trial by jury shall remain inviolate," is for future hearing.

I have not advanced these observations in the way of objections, for the result of the court's opinion is a consummation for which I have devoutly hoped; but to indicate merely that our decision upon the fourth proposition—the right of trial by jury—is not settled by this decision and should not be so regarded, and further, in the event that it be finally held that a jury trial cannot be dispensed with, under our present constitution, that the objection may be easily over-

come without doing violence to the purpose or principle of the act, and without amendment to the constitution, by providing that, in the event of a dispute as to the amount of compensation, a jury shall be called to try that issue and that its verdict shall be conclusive.

Upon the fourth proposition, therefore, I reserve my opinion until such time as its expression will have the force of law.

There being no question that the relator has a right to recover the amount due on its account, it follows that the writ should issue.