[No. 28148.   Department One.   May 1, 1942.]

PACIFIC IRON & METAL COMPANY, *Respondent,* v. THE
DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant.*[1]

*The Attorney General, T. H. Little,* and *Edw. S.
Franklin, Assistants,* for appellant.

*Charles F. Riddell,* for respondent.

*Harry Ellsworth Foster, amicus curiae.*

ROBINSON, C. J.—Pacific Iron & Metal Company, a
dealer in junk, or, as it prefers to have it said, "in
secondary raw materials," applied to the department
of labor and industries for permission to report certain

[1]Reported in 125 P. (2d) 301.

of its operations in classification 38-2 of the risk classifications specified in the workmen's compensation act (Rem. Rev. Stat. (Sup.), § 7676 [P. C. § 3471]). The supervisor, after an investigation, denied the application. The joint board affirmed the action of the supervisor. Upon appeal to the superior court, that court reversed the order of the joint board, and directed "that the said Pacific Iron & Metal Company is entitled so to segregate its payroll and so to report in Class 38-2 all of its employees engaged in its rag department." This, we understand, refers only to those employees working on the second floor of respondent's building. The department has appealed from this judgment.

The operations conducted by respondent are described in the court's findings as follows:

"1. The Pacific Iron & Metal Company is engaged in business with its office and place of business at 2230 to 2250 Fourth Avenue South, Seattle, Washington, where it operates a two story and basement concrete building with a yard to the south of the building.

"2. The building has two stories and a basement. On the upper floor the company conducts the operation of sorting rags. The rags are dumped by employees onto an endless rubber conveyor belt where women stand and sort them into open mouthed gunny sacks and barrels. The rags are sterilized and laundered outside of the plant and when the rags return to the plant other women operate a cutting machine which cuts sleeves, garments and other rags which are not flat so that after the cutting operation the rags are all flat and cut to size. The buttons are pulled off and the rags are sorted and are then taken to the first floor and there baled. In this department on the second floor there are from seven to fifteen employees. From two-thirds to three-fourths of these are women whose work is very light and who work exclusively in that department.

"3. On the first floor of the building are received and shipped rags, non ferrous metals, paper and rubber in which the company deals. On that floor also the

sorted rags are baled. On that floor are employed from five to eight men (three continuously) some of whom also assist in handling the rags on the second floor. About one-third of the material on the first floor is non ferrous metals. The rest consists mostly of rags and paper.

"4. The basement is a storeroom for the rags and non ferrous metals, which latter are much lighter and more valuable than the iron in the yard. The non ferrous metals are not processed. They require no treatment, and after segregation are shipped out in exactly the same condition in which they are received except that an occasional piece of iron may be knocked off a piece of copper or brass.

"5. Outside the building are stored piles of rubber tires, whose value is small compared to bulk.

"6. An average of from five to seven men, of the twenty to forty people employed, work in the yard outside the building in the scrap iron department where scrap iron is sorted and prepared for various uses in steel mills and foundries. It is prepared partly by means of power driven shears and derrick. Torches are also used to cut the iron.

"7. The rag department is inside the building entirely separated from the scrap iron yard. There is no connection at all between the rag and warehouse departments on one hand and the scrap iron department on the other. The employees of the rag and warehouse department are never subjected to any hazard from the scrap iron operation."

The findings of the court further recite:

"8. The following facts are disclosed by the records of the Department of Labor & Industries. Firms whose main operations are in Class 10-2 and who have several distinct risk classifications, may be allowed segregation of payroll reports for premium to the Department of Labor & Industries where their several operations are separate and distinct from the main operation, such as power house in Class 13-2, machine shops in Class 34-2, logging in Class 50-1, logging railroad operation and maintenance in Class 50-4, booming logs in Class 50-2 and pile driving in Class 2-1. Many firms

whose main operations are carried on in one class or another are permitted to report segregated payroll premium reports to the Department of Labor & Industries, such as road maintenance in Class 8-3, road construction in Class 1-1, bridge building in Class 2-1. Where operations are carried on as junk dealers in Class 6-4, a segregation of payroll is permissible where the same firm carries on a separate and distinct operation of machinery dismantling in Class 6-3, railroad dismantling in Class 6-3 and where the same firm enters the business of constructing a building. They are required to segregate their payroll for the purpose of reporting premium to the Department of Labor & Industries into the several classes of distinct operations such as carpenter work in Class 5-5, electrical wiring and installation, Class 6-1, painting in Class 5-4. Operators of furniture manufacturing, Class 29-3, segregate upholstering department and cloth (working in) in textile N. O. S. (not otherwise specified), Class 38-2, if operations are separate and distinct. There are various combinations of segregation of payroll of individual firms permissible and required. The cost records of the Department show that working in cloth and textiles N. O. S., Class 38-2, are less hazardous than the operations of junk dealers in Class 6-4 and that the rates fixed by the Department of Labor & Industries for cloth (working in) and textile N. O. S. in Class 38-2 are based on accident cost in that class and the rate fixed by the Department for that class in 1939 is industrial insurance .0003 cents per hour and medical aid is .001 per hour. The cost records of the Department of Labor & Industries show operations of junk dealers, Class 6-4 as a greater hazard than Class 38-2 and that the rate fixed by the Department for 1939 in Class 6-4 is industrial insurance 3 cents per hour and medical aid 2 cents per hour."

The parties to this appeal have presented the matter from different angles. The respondent attempts to justify the judgment appealed from upon the ground that it is consistent with the equitable principle that the rate paid with reference to a workman should be

directly proportionate to the hazard pertaining to the work which he performs. Hence, it contends that it is entitled to have those of its employees who work under conditions which are not hazardous so classified as to take a much lower rate than is provided for junk dealers, a rate proportionate to the slight risk or hazard to which they are actually exposed, such a rate as is prescribed with reference to other establishments, all of whose employees are doing work similar to that which they do.

The appellant, while recognizing the general equity of the principle invoked by the respondent, contends that the workmen's compensation act proceeds upon the theory that each class of industry should bear its own losses, and that, although, in each industrial establishment, there may be, and generally are, some workmen who are subject to great hazard, and others to very little, it is the average hazard which determines the rate, and that the principle invoked by the respondent is by no means disregarded, since the average rate is directly proportionate to the average hazard.

The basic theory of the act is as contended by appellant. We so held in the original case brought to determine the constitutionality of the act shortly after its passage. *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466. The legislature made its original rate classifications on that theory, and has ever since continued to do so. It recognized, from the first, however, that the classifications and rates so fixed might work injustice to a single establishment which carried on several of the occupations listed, and provided for such contingencies:

"If a single establishment or work comprises several occupations listed in this section in different risk classes, the premium shall be computed according to the pay roll of each occupation if clearly separable;

otherwise an average rate of premium shall be charged for the entire establishment, taking into consideration the number of employees and the relative hazards. . . ." Laws of 1911, chapter 74, pp. 349, 356, § 4.

By subsequent amendments, in which § 4 of chapter 74, Laws of 1911, was completely overhauled, numerous changes and additions have been made to this original provision, for the text of which changes see: Laws of 1923, chapter 136, p. 387; Laws of 1931, chapter 104, p. 304; Laws of 1937, chapter 89, p. 366. The statute governing the case at bar is found in Laws of 1939, chapter 138, p. 417; Rem. Rev. Stat. (Sup.), § 7676, p. 265. It reads as follows:

"If a single establishment or work comprises several occupations listed in this section in different risk classes, the premium shall be computed according to the workmen hours of each occupation, or in the discretion of the Director of Labor and Industries, a single rate of premium may be charged for the entire establishment based upon the rate of premium of the occupation reporting the largest number of workmen hours: *Provided,* That when a single establishment or work comprises distinct different risk classes, each employing a considerable number of persons, the right to have the premium computed according to the number of workmen hours of each occupation shall not be denied the employer without hearing: *Provided further,* That any employer desiring to report his operations in the various distinct risk classifications subsequent to the passage of this act, must before so reporting, notify the Director of Labor and Industries in writing of such fact, prior to the first day of the month in which such employer desires to segregate his operations, and inform the Director of the segregated classifications he desires. After an employer has segregated his operations into the various distinct risk classifications, unless the employer and the Director agree to the contrary, the employer must continue to report in those segregated classifications as long as they exist

in his operation and involve a considerable number of employees."

■ It will be noted that this statutory provision opens with a condition precedent: "If a single establishment or work comprises *several occupations listed in this section in different risk classes, . . .* " (Italics ours.) When that condition is satisfied, and then only, the premiums may be computed according to the workmen hours of each occupation, or, in the discretion of the director of the department, at a single rate for the entire establishment based upon the rate of the occupation reporting the largest number of workmen hours. The original act set up this condition precedent, and, to the point above quoted, it has been preserved in the same language in all the subsequent amendatory acts.

■ The respondent, Pacific Iron & Metal Company, a single establishment dealing in junk, and for many years classified in "Class 6-4 Junk dealers" and paying the rate with respect to its employees specified for that class, has no right to have those employees working upon the second floor of its junk warehouse classified so as to take a lower premium, nor has the director the lawful right to so classify them, simply because, as factually found by the court, their work is not more hazardous than that of workmen doing somewhat similar work in other establishments, the payrolls of which are assessed at a lower rate. As a condition precedent to such reclassification, it was incumbent upon the respondent to prove that it was carrying on in its establishment another occupation in addition to that of dealing in junk, an occupation separately "listed" in § 7676.

The trial court concluded, from the facts found and hereinbefore set out, that the work done upon the second floor of respondent's junk warehouse constituted a different and distinct occupation, listed in

§ 7676 as class 38-2. This occupation is described and defined in such listing as follows:

"38–2  Cloth (working in)..............
Textiles (manufacturing) .......
Textiles (N. O. S.)...............
Tailoring and alteration estab-
lishments or departments having
power-driven machinery ........
(Class 38-2 includes all operations
in connection with manufacturing,
alteration and repair of cloth and
textiles by employers engaged in
such operations as a business or
industry)" Rem. Rev. Stat. (Sup.),
§ 7676, p. 258.

We cannot agree with the trial court's conclusion. It seems clear to us that the department correctly held that the respondent is not carrying on the occupation of "Cloth (working in)" on the second floor of its junk warehouse, but, in sorting rags and preparing them for market, an operation universally carried on in dealing in junk; and, surely, it cannot fairly be said that, in sorting rags, pulling off buttons, and cutting up rags to fit them for baling, it is engaged in "Textiles (manufacturing)," or "Tailoring," or, "as a business or industry," in "operations in connection with manufacturing, alteration and repair of cloth and textiles."

Respondent not having shown that its single establishment carried on any occupation listed in § 7676, other than that of junk dealer, the judgment appealed from must be reversed. It is so ordered.

MILLARD, MAIN, STEINERT, and BLAKE, JJ., concur.